HEARD NOVEMBER TERM, 1876.

## *Ex Parte* Norris.

To constitute an officer *de facto*, he must have a presumptive or an apparent right to exercise the office, resulting from either full and peaceable possession of the powers thereof, or reasonable color of title, with actual use of the office.

Where two persons are each in possession of the office of Governor and claiming by an apparent title, and the question as to which is entitled to discharge the functions of the office arises in a collateral proceeding, it must be decided by determining which has the best apparent right.

Under the provision of the Constitution declaring "that the person having the highest number of votes shall be Governor," the candidate who, according to the returns of the Managers of Election, has received the highest number of votes is entitled, where there is no contest, to the possession of the office, and if he takes possession of it without going through the regular form of installation he is at least *de facto* Governor.

An incumbent of the office of Governor, who, being a candidate for re-election, is defeated, but who, nevertheless, claims the office, gets himself inaugurated as if he had been elected, and takes possession in part of the office, is not entitled to be recognized as Governor holding over nor as Governor *de facto* against the person who received the highest number of votes and who also has entered upon the discharge of the duties of the office.

This was a petition to the Supreme Court entitled "*Ex parte* Tilda Stephens, *alias* Tilda Norris," for a writ of *habeas corpus*.

The case was referred to a Referee to take testimony and report the same to the Court.

On February 15, 1877, he submitted his report, wherein he referred to as the documentary evidence taken by him four (4) exhibits, the first being the Journal of the House of Representatives presided over by W. H. Wallace as Speaker; the second the Journal of the Senate; the third a copy of the oath of office taken by Wade Hampton as Governor of the State of South Carolina;

and fourth the Journal of the House of Representatives presided over by E. W. M. Mackey as Speaker.

The oath of office of Wade Hampton as Governor referred to in the report was in the form prescribed by the Constitution, bore date December 14, 1876, and was subscribed before T. J. Mackey, Circuit Judge, and J. Q. Marshall, Trial Justice.

The Referee also submitted the following as the testimony taken by him:

Mr. John T. Sloan, Sr., a witness in behalf of the petitioner, being sworn, in response to interrogations by Mr. LeConte, says:

I am the Clerk of the House of Representatives of the State of South Carolina; I was elected to that position on the 28th of November, 1876. I make, and have the custody of, the Journals of the House of Representatives; they are made in manuscript and then printed, and, in such printed form, are kept as the records of the House. The printed paper introduced in evidence, and marked Exhibit "A," is the Journal of the House of Representatives for the session commencing on the 28th November, 1876, and ending on the 22d of December, 1876.

The notice and invitation addressed to the Senate of South Carolina, signed by W. H. Wallace, Speaker of the House of Representatives, and set forth on page 3 of the first exhibit of the proceedings of the House of December 13th, 1876, was delivered to me by the Speaker, with the request that I would deliver it to the Senate. I, about 12 o'clock of the 13th of December, proceeded to the State House, and, presenting a card of admission to the Senate, signed by R. H. Gleaves, President of the Senate, demanded admission and was refused. I first went to the East door, and was there told by the constabulary to go to the front door. I then proceeded to this door, where I presented this card, and was there met by a Constable barring ingress. Behind the Constable there were United States soldiers with fixed bayonets. I was here refused admission. Immediately after this Colonel James A. Hoyt, who accompanied me, and who gave me this card, presented a similar card and was admitted. After his admission, I handed him the notice and invitation, hereinbefore referred to, with the request that he should deliver the same to T. B. Jeter, the Senator from Union.

In conversation with Mr. Josephus Woodruff, Clerk of the Senate, afterwards, he informed me that the notice and invitation had been received by the Senate and would appear upon the Journal of the Senate, and directed a copy of the printed Journal to be given to me by Mr. Shrewsbury, the Superintendent of the Republican Printing Company. · I received the printed copy, which is now produced in evidence and marked Exhibit "B." I called Mr. Woodruff's attention to the fact that the reception of the notice and invitation by the Senate did not appear upon the printed Journal. He said that he had been mistaken about its appearing upon the Journal, but that it had been received; that Senator Jeter had handed it to him, and that he had delivered it to the presiding officer. When the election returns were opened and published, as appears upon pages 3, 4 and 5 of the Journal for December 14th, in addition to the tabular statement and certificate of the Secretary of State, referred to in the Journal, there were before the House certified copies of the original returns of the County Boards of Canvassers, made by the Clerks of the Court of the several Counties, except as to the Counties of Darlington and Kershaw; and, as to these Counties, the votes, as given in the tabular statement, sworn to by Mr. Scoffin as having been taken from the returns in the possession of the Board of State Canvassers.

On the 14th of December, when the returns were opened and published by the Speaker, there were some of the members of the Senate present; I do not know how many. There were also some present when the oath of office was administered to Governor Hampton.

Cross-examined by Mr. Cavender:

I mean to say that I am the Clerk of what is known as the Wallace House.

First exhibit is a correct copy of my manuscript Journal of the House. The Journal of the House, from the 13th of December until the adjournment, was printed daily; from the 28th of November to the 12th of December, inclusive, the Journals were printed during the sitting of the House and after the adjournment. After the Journal was printed it was distributed to the members.

When I applied for admission to the State House, I told the Constable who stopped me at the door that my business was to deliver to the Senate a message, and presented the card of admission. When I returned to the House, I reported these facts to the Speaker.

The Speaker did not report them to the House. When I called Mr. Woodruff's attention to the fact that the notice and invitation did not appear upon the Journal of the Senate, he replied that he had been mistaken; he had confounded it with another message which had been formerly received, but that the communication was received.

When the members of the Senate who were present at the opening and publication of the votes for Governor came into the House of Representatives, they did not come in as a body, and were not announced as the Senate; they came in individually. The same applies to their attendance at the inauguration of Governor Hampton.

In reply by Mr. LeConte:

The Journal was printed by authority of the House, as appears in the Journal itself.

When I went to the State House with the notice and invitation, I did not mention my official character.

Hon. Henry A. Meetze, a witness in behalf of the petitioner, being sworn, in response to interrogatories by Mr. LeConte, says:

I am a member of the Senate of the State of South Carolina from Lexington County. Was present in the Senate on the 13th day of December, 1876. Major Jeter, who is also a Senator, called me into consultation as to what course he should pursue in delivering an invitation from W. H. Wallace, Speaker of the House of Representatives, to the Senate to be present on the next day, the 14th, in the House of Representatives, to hear the count of the votes for Governor and Lieutenant Governor of the State. I advised that the paper take the regular course, which was by delivery to the Clerk. I saw him deliver it to the Clerk, and the Clerk hand it to the President of the Senate.

My reason for the advice was the difficulty I had had on a former occasion in getting before the Senate a message from Mr. Wallace, as appears by the Journal of the Senate.

I do not know what became of the communication; it was never presented to the Senate. I mean the President did not lay it before the Senate.

Cross-examined by Mr. Cavender:

I do not recollect whether the invitation was in an envelope or not. If it was, I cannot now say whether it was sealed or not. If sealed, it was after I saw and read it.

I am not sure whether the Senate was in session at the time of the delivery of the message to the Clerk or not.

My recollection is that the Senate was in session at the time the Clerk handed it to the President. By President I mean R. H. Gleaves. My impression is that the Senate was in session when the communication was handed to the Clerk.

Hon. Thomas B. Jeter, a witness in behalf of the petitioner, being sworn, in response to interrogatories by Mr. LeConte, says:

I am a member of the Senate of South Carolina from the County of Union. I was present in the Senate on the 13th day of December last. Mr. Hoyt, of Anderson, came into the Senate chamber and handed me a communication signed by W. H. Wallace, Speaker of the House of Representatives, addressed to the Senate, inviting the Senate to be present on a day named for counting the votes for Governor and Lieutenant Governor. The purport of said communication is the same as that found in the Journal of the House of Representatives, on page 3, of the 13th of December. I do not remember whether or not the language is identical. This was during the session of the Senate on that day—some time between the hours of eleven and two o'clock. I do not remember the initials of Mr. Hoyt's name; he was connected with the newspaper at Anderson, and he was a member of the Democratic Executive Committee. I consulted with Major Meetze, one of the Senators, what should be done with the communication, and we decided that it should take the regular course. I either sent it or handed it to the Clerk of the Senate. I do not know what became of the notice afterwards.

Cross-examined by Mr. Cavender:

There was a day named in the notice, but I do not remember the day. When I said we decided that the communication should take the regular course, I meant that it should take the course we gave it instead of my bringing it to the attention of the Senate upon my own motion. The usual course of presenting communications from the House inviting the Senate to participate with the House in the performance of any duty is not by announcement at the bar of the Senate.

Reply by Mr. LeConte:

I think Major Meetze had, on some former occasion, some difficulty in bringing to the attention of the Senate a communica-

tion from the House of Representatives.  He attempted to present it himself, and was ruled out of order.

Mr. LeConte now produced the oath of office of Governor Hampton and proved the signatures, a copy of which is hereto attached.  Copy filed by consent.

Also the record in the case of the State, *ex relatione* W. H. Wallace as Speaker of the House of Representatives, against H. E. Hayne as Secretary of State and E. W. M. Mackey—proceeding for *mandamus* in the Supreme Court.

Mr. Josephus Woodruff, a witness in behalf of the State, being sworn, in response to interrogatories by Mr. Cavender, says:

I am the Clerk of the Senate of South Carolina; have been such ever since 1868.  I was present in the Senate chamber, acting as such, on the 13th day of last December.  I have no positive recollection of the date or the purport of the communication, but do remember Senator Jeter handing me a communication directed to the President and members of the Senate; whether on that day or not I cannot say.  I handed it to the presiding officer of the Senate; I do not remember whether it happened to be, at that time, Mr. Gleaves or Mr. Swails.  I do not know what the presiding officer did with that paper.  So far as my recollection goes, it was not submitted to the Senate; if it had been, it would have been entered upon the Journal, and would now appear there.  No communication is put upon the Journal without being first laid before the Senate.

I will add, after hearing the testimony of Colonel Sloan, that the paper I referred to in my conversation with him was a paper read by Senator Meetze, relative to the organization of the House of Representatives, at the Carolina Hall, on Wednesday, November 29, 1876, and appears in the printed Journal of the Senate, pages 16 and 17.

I have no knowledge of any other communication from Mr. Wallace, Speaker of House of Representatives, being offered or delivered to the Senate, to its presiding officer or to myself.

Cross-examined by Mr. LeConte:

I am not sure that I read the communication; I think I glanced over it and caught its purport.  My recollection of it is that it was a resolution of the House of Representatives presided over by

Mr. Wallace, relative to the counting of the votes for Governor and Lieutenant Governor of the State.

Hon. R. H. Gleaves, a witness in behalf of the State, being sworn, in response to interrogatories by Mr. Cavender, says:

I am Lieutenant Governor of the State of South Carolina and *ex officio* President of the Senate; have been such since November, 1872. I was in the Senate, acting as its President, a part, if not all, of the day, on the 13th of last December. I have no recollection of receiving from Mr. Woodruff, Clerk of the Senate, any communication such as that on page 3 of what purports to be the Journal of the House of Representatives of the State of South Carolina for Wednesday, December 13th, 1876, part of first exhibit now shown me.

The form of the communication shown me is not the form adopted by one branch of the General Assembly in inviting the other branch to unite in the performance of a duty common to both, nor is it the form hitherto adopted by the House of Representatives in inviting the Senate to meet with the House at the opening and publishing of the returns of the election of Governor and Lieutenant Governor. The usual form would be for the House to adopt a concurrent resolution and send it to the Senate for concurrence.

I have never known, to my recollection, of any other course being pursued. The day for opening and publishing such returns is proposed by the House in the concurrent resolution, but the Senate may change the day by amendment. If the House concurs, very well; if not, the resolution falls, or the Senate may take no other action on the resolution, and it is laid on the table.

There is one exception to what I have mentioned as the usual form of communication between the two houses in such cases, and that is in the matter of the election of the United States Senator. In that case the day is fixed by law of the United States, as also the manner in which the election shall be conducted.

Cross-examined by Mr. LeConte:

I have stated that I am Lieutenant Governor of the State and *ex officio* President of the Senate; this by the declaration made by the two houses in Joint Assembly on the 5th day of December, 1876. That is, the Senate and the House of Representatives presided over by Mr. E. W. M. Mackey.

Hon. S. A. Swails, a witness in behalf of the State, being sworn, in response to interrogatories by Mr. Cavender, says:

I am a member of the Senate of South Carolina from Williamsburg County, and have been since 1868. I am also President *pro tem.* of the Senate, and have been since November, 1872.

I preside in the Senate in the absence of Mr. Gleaves. I was present in the Senate on the 13th of December last, but did not act as presiding officer on that day.

I have no knowledge of any communication being received through the Clerk, or otherwise, on that or any other day, such as that on page three (3) of what purports to be the Journal of the House of Representatives of the State of South Carolina for Wednesday, December 13, 1876, part of first exhibit now shown me.

I have heard the testimony of Mr. Gleaves and concur with him in his statement of the usage as Joint Assembly. The meeting of the two houses for opening and publishing the returns of the votes for Governor and Lieutenant Governor, strictly speaking, is not a Joint Assembly but a joint convention. In all Joint Assemblies the President of the Senate presides; in this joint convention the Speaker of the House presides. In the latter case, to the best of my recollection, the custom has been for the House to notify the Senate that it had received the returns, and either proposing a day or asking the Senate to name a day for the meeting of the houses in joint convention. If the Senate does not appear on the day fixed by the House, it has the right to change the day by amendment, as mentioned by Mr. Gleaves. The Senate claims the right to control either message or resolution as to time, subject to amendment by the House, but the whole is by joint agreement.

I have been on the Speaker's stand at every opening and publishing of returns of elections of Governor and Lieutenant. Governor since I have been President *pro tem.* of the Senate. The President and President *pro tem.* have seats on the platform as representing the Senate. The opening and publishing of the returns by the Speaker is in the immediate sight and observation of the President of the Senate.

Cross-examined by Mr. LeConte:

The usage where a joint convention is proposed for opening and publishing the election returns is, as I recall it, that the House

sends a message notifying the Senate that it has received the returns, and either fixing the day or asking the Senate to fix a day for meeting in joint convention.

Any change in the day fixed by the House would be effected by an interchange of messages.

I had no official notice of the opening and publication of the election returns by the House of Representatives presided over by Mr. Wallace, and as a Senator I would not recognize any notice that did not come to me officially.

I have no doubt I saw the notice of it in the newspapers. I do not know whether I saw it in the newspapers before or after the proceedings.

Hon. R. H. Gleaves, recalled, in response to interrogatories by Mr. Cavender, says:

During the four years and more that I have been President of the Senate, I have twice attended joint conventions for opening and publishing the returns of election for Governor and Lieutenant Governor, and occupied a seat on the Speaker's platform, at the side of the Speaker, as representing the Senate. On each occasion the Speaker, after opening the returns, exhibited them to me for examination before publishing them. In 1874, Speaker Elliott, after opening the returns, handed them to me for examination before publishing them. In 1876, Speaker Mackey, after opening the returns, exhibited them to me before publishing them.

Hon. R. B. Elliott, a witness on behalf of the State, in response to interrogatories by Mr. Cavender, says:

The usage, so far as my knowledge extends, touching the opening and publishing of the election returns of Governor and Lieutenant Governor, is as stated in the testimony of Mr. Gleaves and Mr. Swails. As the mode of proceeding after the joint convention convenes, I will state that, in 1874, I was Speaker of the House, and, in opening and publishing the returns of the election of that year, I followed the practice established by my predecessors under the present Constitution of the State. The practice was this: As Speaker, I opened the returns of the election by Counties; as each County was opened, it was handed by me to the President of the Senate for his inspection, after which the vote for such County was

declared to the two houses. The Clerk of the Senate and the Clerk of the House made tabulated statements of the votes published. After all the returns had been opened and published, the tabulated statements were footed up and compared. From those statements I declared the result of the election.

*Conner*, for the petitioner, filed the following argument:

The decision of Judge Carpenter in the case *Ex Parte* Peter Smith may be safely regarded as the strongest argument in favor of the right of Mr. Chamberlain which has been or can be made. Destroy that, and the claim rests on no basis at all.

I shall, therefore, direct my argument mainly to an examination of that decision.

It is conceded that Governor Hampton received the highest number of votes. It is conceded also that the "election confers the title," but it is denied that Governor Hampton has the right to possession of the office.

Can this conclusion be maintained? I do not mean by United States bayonets, for they can support anything, but by reasoning which a Court will accept.

The title draws to it the possession and the right of possession. No power can legally separate the office and the possession of the office.

The title may be illegal or the possession illegal, but to say that one man is legally entitled to the office and another legally in possession of it is to misuse language.

It is conceded that the title is legal. It then follows, necessarily, that the withholding the possession is illegal.

The reasonable conclusion would seem that those who act illegally should suffer. But the judgment and conclusion of Judge Carpenter is that he who has the legal title and right shall suffer, and he who illegally withholds possession shall profit by his wrong and enjoy the possession.

Truly, as Lord Coke says, the wisdom of the law is not as the wisdom of ordinary men.

Under the Constitution of this State the Courts cannot try the question of title to the office of Governor. This Judge Carpenter concedes.

He also concedes that questions political cannot be decided in the Courts.

These concessions illustrate how concisely a proposition may be laid in theory and how utterly it may be ignored in practice.

The Judge says: "The duty of the Court is confined to inquiring whether either of the claimants has complied with the constitutional conditions precedent to entering upon the discharge of the duties of Governor."

If this doctrine is true, then, so far from the Court being confined or limited, it has absolute power to determine the purely political question of who is Governor.

If the Court can decide that there are conditions precedent and that the Governor elect has not complied with them, there is an end of the question. The power to make a Governor is in the Courts and not in the people. The people may have elected him, the Legislature may acquiesce, but the Court says: Stay—we do not think you have complied with the conditions precedent, and you cannot enter in.

If this is the power of the Court, it is power absolute and supreme. If it has the power, it can exercise it as it pleases.

There is no guaranty for an honest decision except the honesty of the individual. But the very object of written constitutions and an exact partition of powers into three independent co-ordinate departments was to create a government of laws, not of men; to find the safety of the citizen not in the probity of the individual but in the limitation of his power. Take the case where the Governor elect takes but fails to subscribe the oath, constitutional condition precedent omitted.

If this doctrine is law, and the Court must be satisfied of the performance of the conditions precedent, then no man can be Governor until he has received the *imprimatur* of the Court.

What, then, becomes of the independence of the Executive?

Who makes the real Governor? Not the people, but the Court. The people but place a barren scepter in his grip. The King-maker is the Court.

If the title and the office are to be regarded as distinct and separate, and the election confers the title, who, I ask, confers the office? Whence does the right to be Governor *de jure* and *de facto* come? Surely from the people and through the election.

The Legislature can only declare the result of the election; the Court can only recognize it. Neither, separately, nor in concert, can alter the result or impair it.

They cannot, together or separately, make a Governor.

The people alone can do that. So clear is this, that in cases of contest between rival claimants, if the General Assembly cannot decide who has the majority, it must be referred to the people to hold a new election.

Here there is no question as to who received the majority, and there is no contest before the General Assembly.

To say that a man can be legally elected, can desire to be Governor, and yet cannot be Governor, is a proposition new and startling.

Who can keep him from being Governor?

Surely not one of the departments of the government! If it can singly, or in combination, then it is the sovereign and the executive department is no longer independent.

But apart from the point that the Courts have no power to determine what are conditions precedent, and whether they have been performed, the question remains:

Were there any conditions precedent?

This is the pivotal point of Judge Carpenter's argument, and the fallacy which pervades the entire argument is in supposing that there are any.

It cannot be shown that Governor Hampton has failed to comply with a single condition precedent.

See the Constitution.

If there has been any non-performance of duty, it is on the part of either the Speaker of the House or of the Senate.

The argument then comes to this: that if either the Speaker or the Senate fails in its duty, what follows? that they shall suffer? No. But that the Governor and the State shall suffer.

This is a new doctrine of vicarious atonement. Great stress is laid on adhering to constitutional requirements.

If rigidly adhered to, there never has been, or can be, a Governor constitutionally declared.

The votes shall be published "as soon as the General Assembly shall have organized *by the election* of the presiding officers of the two houses."

Now the Senate is never organized by the election of its presiding officer, and so the time for counting the votes never constitutionally could come.

But nobody ever supposed that the inability to comply with this constitutional condition precedent prevented a Governor from entering upon his office.

Passing from the conditions with which the Governor must comply, we find the decree holding that the Constitution intends the united action of both houses to precede, not only the installation of the Governor, but all legislative action.

The error is in assuming that the opening of the returns is a legislative act.

It is no act, except in cases of contest; the two houses are passive, and, in cases of contest, their functions are judicial rather than legislative.

But the decree says: "From the frequent iteration in the Constitution of the term 'General Assembly,' in connection with the election, opening and publishing the returns, and the installation of the Governor, the actual presence of both houses would appear to be necessary for the legal and proper performance of such duties."

Singular to say, the term "General Assembly" is not used in connection with the election, opening and publishing the returns, except to indicate *the time* at which the several acts are to be performed.

See Constitution; and there are no duties to be performed by the General Assembly in connection with the election, opening and publishing the returns.

The decree continues: "The absence of either (house) would render nugatory such an exercise of legislative power."

Strange confusion of terms and reasoning. The conclusion rests on a semble; the semble on a fact that has no existence; and yet on this conclusion the whole judgment is made to rest.

What legislative power, and what exercise of it? The decree is silent. Going a little back, it ceases to be "power," and becomes duties; and going still further back, we find nothing—the line runs out. There is no antecedent.

If it is said the power refers to the duties and the duties refer to the connection of the General Assembly with the election, opening and publishing the returns, I have already shown that there are no such duties, and the reference is to nothing.

I have thus endeavored to show that there is no legislative Act or legislative power in the creating or installation of the Governor.

I concede that, under the Constitution, both houses should have been present, and that one was not. Why? Let the decree answer: "The Senate persistently refused to recognize the legal existence of the House." Should have said willfully and illegally refused.

By purely political party vote the Senate overrules the decision of the Supreme Court that the House was legally organized; violates the Constitution, which forbids it to exercise judicial power. And yet on that violation by the Senate of its duty and of the Constitution the right of Mr. Chamberlain to be Governor is placed— a legal right resting on a breach of duty and a violation of the Constitution.

If the Senate can by such action defeat their Governor's right, then a minority of one can effect it and a single man determine who shall administer the State as Governor.

The intent of the Constitution is that two houses shall attend. The intent also is that the Governor elected by the people shall have the office.

From the perversity of the Senate both intents cannot be carried out. Which shall prevail—the incident or the principle, the form or the substance?

Which does most violence to the Constitution—to continue in office a defeated Governor or for the legal Speaker of a legal House to open and publish the returns in the presence of the House and such Senators as will attend? Take the case I put of a minority of one. Let the other thirty-two Senators attend; it is not the Senate. But does the absence of that one man do more violence to the Constitution than to continue the defeated Governor under a former title which he has surrendered?

The conclusions of law are:

That Chamberlain was not legally installed.

That Hampton was not legally installed.

Therefore, there is no Governor, is the logical sequence.

The premise is the installation, and, from the want of installation, the Judge deduces the want of office,—making the installation more important than the election.

The right of Chamberlain, who was not elected, and of Hampton, who was, are made to depend on exactly the same thing—the mere ceremonial of installation.

But the logical process by which Mr. Chamberlain is continued as Governor is equally questionable.

As Governor Hampton was not legally installed, Mr. Chamberlain continues, because the Governor holds over until his successor is chosen and qualified—not installed, but chosen and qualified.

Hampton, it is conceded, was chosen. What is meant by qualified? Simply taking the oath of office.

The Constitution never mentions installation. A man does not install himself. It says qualified; and that, and that alone, can the Governor do—qualify, take the oath of office.

On the theory which Judge Carpenter propounds, Governor Hampton has not been and never can be installed, and Mr. Chamberlain is Governor, not by the will of the people, but by the fiat of the Court.

The Constitution never meant that there should be a *de jure* Governor and a *de facto* Governor during his term of office.

The reasoning which leads to such a conclusion is suicidal.

What was omitted in the case which should have been performed? Not the opening and publishing the votes by the Speaker.

Simply the formality of doing it in the presence of both houses.

This omission was not the default of the lawful House of Representatives nor of the Governor elect.

The omission did not change the result of the election. The truth of the election as declared by the House was the truth as shown by the returns, viz., that Hampton received the highest number of votes. The Constitution declares that he is Governor, and the Court should have so held.

*Elliott*, for the State:

The first question raised by the record in this case is the validity of the pardon issued by Wade Hampton.

This inquiry directly involves the question: Is Hampton Governor?

We say, first, he is not Governor, because he has not received the highest number of votes cast in the late election.

We say this on the authority of the determination of the Board of State Canvassers, certified to this Court, respecting the vote of *Edgefield* and *Laurens* Counties.

It is true that the Board were not authorized to canvass the vote for Governor, but it is known that the vote was not essentially different for Governor from that for other State officers, and we have

the decision of that Board to the effect that, owing to fraud and illegal practices in the Counties aforesaid, it was unable to determine the election in those Counties.

Without the vote of these Counties, Hampton cannot pretend to have the highest number of votes.

We say, second, that whatever the result of the election may be when duly ascertained, that result has, in point of fact, never been duly ascertained in the mode prescribed by the Constitution of the State.

The Constitution requires that the returns of the election for Governor and Lieutenant Governor shall be transmitted through the Secretary of State to the Speaker of the House of Representatives, and by him opened and published in the presence of the Senate and the House.

Section 4, Article III, of the Constitution of the State reads as follows: "The returns of every election of Governor shall be sealed up by the Managers of Election in their respective Counties, and transmitted by mail to the seat of government, directed to the Secretary of State, who shall deliver them to the Speaker of the House of Representatives at the next ensuing session of the General Assembly, and a duplicate of said returns shall be filed with the Clerks of the Courts of said Counties, whose duty it shall be to forward to the Secretary of State a certified copy thereof, upon being notified that the returns previously forwarded by mail have not been received at his office. It shall be the duty of the Secretary of State, after the expiration of seven days from the day upon which the votes have been counted, if the returns thereof from any County have not been received, to notify the Clerk of the Court of said County and order a copy of the returns filed in his office to be forwarded forthwith. The Secretary of State shall deliver the returns to the Speaker of the House of Representatives at the next ensuing session of the General Assembly; and during the first week of the session, or as soon as the General Assembly shall have organized by the election of the presiding officers of the two houses, the Speaker shall open and publish them in the presence of both houses. The person having the highest number of votes shall be Governor; but if two or more shall be equal and highest in votes, the General Assembly shall, during the same session, in the House of Representatives, choose one of them Governor *viva voce*. Contested elections for Governor shall be determined by the General Assembly in such manner as shall be prescribed by law."

Here are three steps subsequent to the election essential to the ascertainment of the result of an election for Governor:

1. The transmission of the returns through the Secretary of State to the Speaker.

2. The presence, as witnessing and verifying bodies, of the Senate and House.

3. The opening and publishing of the returns, in which is involved, by necessary implication, the work of scrutinizing and counting the returns.

All of these steps are essential elements in the ascertainment of the result. Each of them is an indispensable prerequisite to the conferring upon any one of the *prima facie* title to the office of Governor of the State. The fourth Section of Article III sets forth with great particularity the mode of ascertaining the result of an election for Governor. The mode therein prescribed is not a *mere* empty formula, which may be in part modified or wholly disregarded. It is not merely directory, but comes down to us in its full embodiment as a positive mandate to be strictly observed and followed.

These three steps or processes are deemed by the Constitution to be absolutely necessary to the certain and proper identification of the returns, their safe transmission and freedom from fraudulent manipulation, and their lawful promulgation. The Managers of the election in the several Counties are required to seal up and forward the returns through the mails, in order that they might not be tampered with while they are *in transitu.* The Secretary of State, a high and responsible officer of the State, is made the custodian of them during the interim between the election and the meeting of the General Assembly which is to canvass them to still further insure their protection against alteration or change. The Speaker of the House is *only* to open them in the presence of both houses in order that they who are to give effect to the election may be satisfied as to the identity of the papers upon which their action is to be based.

The Constitution provides that "the Speaker shall open and publish them [the returns] in the presence of both houses."

It does not even say that they shall be aggregated. There are no express words in the Constitution either conferring the power or enjoining the duty of aggregating the returns, yet it is clear to our minds that such aggregation must precede the publication of

the result of the election. We say, therefore, that this power is conferred, this duty is enjoined, by necessary and unavoidable implication.

1. Admitting that anything is to be added by implication, we are equally justified in adding whatever is necessary to the full execution of the powers that are conferred; for it is a general principle that where a power is conferred or a duty enjoined, all powers essential to the execution of the power or duty are carried with it by implication—Cooley's Con. Lim., §§ 63, 64; Story on Con., vol. 1, § 430; McCulloch vs. Maryland, 4 Wheat., 428; United States vs. Fisher, 2 Cranch, 358.

As the result of that, we say it is essential to the discharge of the duty imposed by the Constitution in this Section that the two houses should have the power to verify the returns—to scrutinize, sift and ascertain what was the true and lawful vote. The two houses are to ascertain who has received "the highest number of votes;" that is, the highest number of legal votes, or, at least, the highest number of votes legally returned. To ascertain this fact, they must, necessarily, have the power to scrutinize, sift and verify the returns.

2. We say that this power is conferred not on the House of Representatives alone, but on the two houses acting together.

This is clear from the language of the Section. The returns are to be opened and published not as soon as the House shall have organized by the election of a Speaker, but "as soon as the General Assembly shall have organized by the election of the presiding officers of the two houses, &c." It will also be noticed that the Speaker is to open and publish the returns not in the presence of the House of Representatives alone, but he is to "open and publish them in the presence of both houses."

The Speaker is simply selected as the officer by whom, as the organ of the two houses, this work is to be conducted; and the fact of his selection cannot be held to confer any but ministerial duties upon him individually, or to confer upon the House of Representatives any greater powers than it would have had if the President of the Senate had been selected instead of the Speaker of the House. The power to make the verification and scrutiny of the returns, and to ascertain the result of an election for Governor, is conferred upon the two houses concurrently, to be exercised jointly; the duty imposed is to be performed jointly; and, indeed,

under the provisions of the Constitution it cannot be lawfully performed by one body without the presence—the actual presence—and participation of the other.

Section 1 of Article II of the Constitution of the United States provides that: " * * * The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates, and the votes shall then be counted. * * *."

Here the language is in effect almost identical with the language of Section 4 of Article III of our Constitution. Nothing is in terms required but the *presence* of the two bodies, as in our own Constitution. And in what have the recent discussions of this pro-. vision of the United States Constitution resulted? They have resulted in an almost universal concession:

1. That the presiding officer, namely, the President of the Senate, has none but clerical or ministerial duties to perform in connection with the count of the electoral vote.

2. That the powers of the two houses are equal,—the Senate, by virtue of its presiding officer being the presiding officer of the joint convention, acquiring no greater power over the count than the House has.

3. That Congress has the power to call in question the vote of any State, and, by the concurrent action of both houses, to reject the entire vote of a State.

Now, apply this to our case and it stands thus:

1. The Speaker of the House of Representatives, in the matter of the ascertainment and publication of the vote for Governor and Lieutenant Governor, has only clerical or ministerial powers.

2. That the powers of the two houses in the matter of the ascertainment and publication of the result of the election are equal,—the House of Representatives, by virtue of its presiding officer being the presiding officer of the joint convention, acquiring no greater power over the matter than the Senate has.

3. That the General Assembly has the power to call in question the vote of any County, and, by concurrent action of both houses, to reject the entire vote of a County.

The idea has never been advanced anywhere that the presence and active participation of the House of Representatives at Washington was not absolutely essential in the electoral count. The idea is equally untenable that the presence of the Senate in our own case can for any cause be dispensed with. The Constitution

does not only enjoin it as a duty to be performed by that body, but requires the presence of that branch of the General Assembly as an essential and indispensable prerequisite to the opening and examination of the returns and the ascertainment and declaration of the result of the election.

We say—Third: That not one of these three steps or processes pointed out by Section 4, Article III, of the Constitution and set forth therein as essential elements in the ascertainment of the result of an election for Governor and Lieutenant Governor has been taken by those who claim to support General Hampton as Governor of the State.

*First.* It is not pretended that the returns of the election for Governor and Lieutenant Governor were ever transmitted through the Secretary of State to Mr. Wallace, who claimed the right to them as Speaker of the House of Representatives. Nor is it pretended that he ever had them in his possession. Nor is it pretended that he ever had in his possession certified copies of the duplicates of said returns filed with the Clerks of the Courts of the respective Counties.

On the contrary, the Journal of the House of Representatives presided over by Mr. Wallace shows that the evidence of the election for Governor and Lieutenant Governor of South Carolina, opened and published by the Speaker, was a tabular statement of the votes of the several Counties for Governor and Lieutenant Governor, as sworn to by Mr. John Scoffin.

Who Mr. John Scoffin is, what his authority was, and whence his authority was derived, are not stated on the face of the Journal; nor does it appear that he claimed, or pretended to claim, or is alleged to have had, any authority to act as agent or deputy of the Speaker of the House, of the House itself, or of the two houses, in verifying, scrutinizing and sifting the returns, or in ascertaining the result of the election therefrom.

The secondary evidence submitted by the Speaker consisted of a statement of the vote for Governor at the general elections of 1874 and 1876, certified to by H. E. Hayne, Secretary of State, as from Commissioners' returns "now on file in his office." As "the returns of every election of Governor" are required by the Constitution to be *sealed up* before being transmitted to the seat of government, and are directed to the Secretary of State only for the purpose of having him "deliver them to the Speaker of the House of

Representatives," when such Speaker shall be elected; and as these returns, after being *opened* and published by the Speaker, become a part of the archives of the House and remain there, it is evident that the Secretary of State could not have obtained any official knowledge of the contents of the returns before delivering them to the Speaker, and that the returns themselves are not "now," and never have been, "on file in his office." Even if they were, he could at the furthest do nothing more than give certified copies of them. It would not be within his power to ascertain and certify the number of votes given for the several candidates for Governor, that being a power expressly delegated by the Constitution to the two houses of the General Assembly.

(*a.*) Nothing but the loss or destruction of the original returns could authorize the substitution of other evidence of the election.— Greenleaf on Evidence, vol. 1, §§ 82–84.

(*b.*) These returns were neither lost nor destroyed. If unlawfully withheld, they were legally recoverable by resort to proper legal proceedings. Such remedies have never been exhausted.

(*c.*) *Mandamus* was brought against Mr. Mackey and Mr. Hayne to compel the delivery of the original returns to Mr. Wallace. This Court held that *mandamus* would not lie against Mr. Mackey, but made no decision as to Mr. Hayne.—*State*, ex rel. *W. H. Wallace*, vs. *E. W. M. Mackey and H. E. Hayne.*

No further efforts have been made to recover the returns from Mr. Hayne.

We say, then, that no proper basis has been laid for the admission of or resort to any sort of secondary evidence of the election.

*Second.* As to the second step in the process,—the presence of the Senate and House of Representatives,—it is conceded that no Senate was present when the election of General Hampton was declared. It is, however, claimed that *notice* for a joint convention was given to the Senate but was disregarded by that body.

We deny that the Senate was, as a matter of fact, put in possession, officially, of any notice or proposition or invitation from the House of Representatives presided over by Mr. Wallace to be present on a day named for counting the votes for Governor and Lieutenant Governor. Admitting that a paper purporting to be such a notice or invitation was delivered by one of the Senators to the Clerk of that body, and by him transferred to the President of the Senate, the fact remains that the President of the Senate did not

communicate the contents of the paper to that body, and hence the Senate had no notice of it. Nor was any such notice given in any way then or thereafter, either orally or by being spread upon the Journal of the proceedings of the Senate. Nor does it appear to have been the duty of the President of the Senate to communicate the contents of the paper to the Senate, inasmuch as the paper was entirely informal in its nature, and, viewed in the light of the usage uniformly observed by the General Assembly in such cases, the paper partook no more of an official character than a like communication addressed to the Senate by a private individual would have done. But even assuming that the notice, if such it was, lay open to no objection predicated on a want of formality either in its nature or the mode of its transmission, and that it was the duty of the President of the Senate to apprise that body, officially, of its receipt and purport, it is yet true, as matter of fact, that he did not do so, and, howsoever much he may have been derelict of duty in this regard, his failure left the Senate without any such notice as it is claimed, by the petitioner in this cause, to have received.

But, admitting it to be true that the Senate had notice of the desire or intention of the Wallace House, still the *presence* of the Senate at the opening and publishing of the returns is what is essential, and this cannot be dispensed with. The Constitution, as we have already pointed out, requires it. The failure of the Senate to attend, from whatever cause or with whatever motive, is absolutely fatal to the claim that Hampton is now Governor. The absence of the Senate can in no wise enlarge the powers of the House. The duty is imposed, the power is conferred, upon the General Assembly as one of the three departments of the government, and neither can the duty be performed nor the power exercised by any less authority than the sovereign legislative authority of the State.

It is said, however, that if the actual presence of the Senate is necessary, then one branch of the Legislature can defeat an election. This is doubtless true. If one branch of the people's representatives see fit to take that responsibility, they can do it—just as one branch of the General Assembly, by failing to unite with the other branch, may prevent any provision for an annual tax sufficient to defray the estimated expenses for the current year, although the Constitution makes it obligatory upon the General Assembly to do so, and although the administration of the government cannot be

carried on if the General Assembly fails in its duty therein ; or just as either branch of the General Assembly, by failing to unite with the other branch, may prevent any provision for levying a tax to pay the deficiency of the preceding year, although the Constitution makes it obligatory upon the General Assembly to do so, and although the servants and creditors of the State must need suffer if the General Assembly fails in its duty therein ; or just as one branch of the General Assembly, by failing to unite with the other branch, may prevent any appropriations being made and any money being drawn from the Treasury, even after the taxes have been levied and collected by the direction and authority of the same General Assembly, and although such appropriations and payments from the Treasury are absolutely requisite for the administration of the government and . for the protection and advancement of the best and dearest interests of the people of South Carolina. In neither of these cases would it be pretended that the failure of one branch of the General Assembly to unite with the other in the performance of a duty required by the Constitution to be performed by both confers on the other the power to execute that duty itself; and if not in those cases, why in this? In those cases, as we have shown, the failure of one branch of the General Assembly to unite with the other would result in an utter inability to carry on the administration of the government—in the suffering of the servants and creditors of the State—and in the failure to protect and advance the dearest interests of the people. In this, while the aspirations, and, perhaps, the rights of a candidate for the office of Governor of the State may be defeated, yet the wheels of government are not stopped, nor do the people suffer. The Constitution itself provides a remedy for such an anomalous condition of public affairs. By Section 2, Article III, of the Constitution, it is provided that:

" The Governor shall be elected by the electors duly qualified to vote for members of the House of Representatives, and shall hold his office for two years, and until his successor shall be chosen and qualified."

So that the failure to open and publish the returns of the election for Governor, and to ascertain therefrom who has received the highest number of votes for that office, in the . presence of both houses, does not leave the State without a Governor. The office continues to be occupied by the person who, by virtue of a previous election and qualification, already fills it.

It is no more startling to suppose that one branch of the General Assembly can prevent the declaration of an election or defeat the election itself, than is the proposition on which Hampton's whole claim now rests, namely, that one branch can elect or declare the election.

Besides, if one branch can declare the election, it does not by any means assure the soundness of Hampton's claim; for, as we have already shown, the powers of the two houses are equal, and the body which is indisputably the Senate had declared the election of Chamberlain before the House of Representatives elected or declared the election of Hampton.

3d. The *third* and last step, namely, the opening, scrutiny, verification and publication of the returns *in the presence* of both houses, has never taken place in Hampton's case. Indeed, it is admitted that no such action was had.

But it is said that the *election* itself gives the title to the office, and that the returns show Hampton to have received a majority of the votes.

We say the evidence is the other way, and is that Hampton has not received the highest number of votes.

But, further than this, we deny the proposition that the apparent result of the election confers the right or settles the title to an office. The work and function of the returning authority or canvassing body, whatever that authority be, is essential to create or perfect the title to an office. The legal ascertainment of the election is always and everywhere held to be an essential and indispensable prerequisite to establish the right or title to an office. Hence such machinery is always provided to ascertain the result of an election.

In Cushing's Law and Practice of Legislative Assemblies, Section 229, the principle is thus laid down: "The right to assume the functions of a member, in the first instance, and to participate in the preliminary proceedings and organization, depends wholly and exclusively upon the return or certificate of election; those persons who have been declared elected, and are duly returned, being considered as members until their election is investigated and set aside, and those who are not so returned being excluded from exercising the functions of members, even though duly elected, until their election is investigated and their right admitted."

Again, in Section 240 of the same work, it is said : " The princi-
ples of parliamentary law applicable to the question are perfectly
simple and plain, founded in the very nature of things, established
by the uniform practice and authority of Parliament, and con-
firmed by reason and analogy. These principles are as follows:
First. That every person duly returned is a member, whether legally
elected or not, until his election is set aside. Second. That no
person who is not duly returned is a member, even though legally
elected, until his election is established."       *       *       *       *

In the case of *People* vs. *Miller*, (16 Mich., 59,) the Court say:

" The certificate of election, whether rightfully or wrongfully
given, confers upon the person holding it the *prima facie* right of
holding for a term."

In the case of *Com.* vs. *Baxter*, (35 Penn. St.,) Chief Justice
Lowrie, speaking of title to an office, says: " This [the certificate]
is the legal and *prima facie* evidence of his title to the office."

Again, the same high authority, speaking for the Court in the
case of *Kerr et al.* vs. *Trego et al.*, (47 Penn. St., 292,) says: "In
all cases of this kind, at least in all bodies that are *under law*, the
law is that, where there has been an authorized election for the
office in controversy, the certificate of election which is sanctioned
by law or usage is the *prima facie* written title to the office, and
can be set aside only by a contest in the forms prescribed by law.
This is not now disputed."

" No doubt this gives great power to the election officers, but we
know no remedy for this but by the choice of honest men."

The following cases are also in point: *State* vs. *Churchhill*, 15
Minn., 455 ; *Crowell* vs. *Lambert*, 10 Minn., 369 ; *State* vs. *Sherwood*,
15 Minn., 221 ; *Conger* vs. *Gilmer*, 32 Cal., 75 ; *People* vs. *Jones*,
20 Cal., 50 ; *State* vs. *Avery*, 14 Wis., 122.

Reasoning from these authorities, it would seem to be clear that
General Hampton is utterly without title to the office of Governor
of this State. The only thing that could give him any shadow of
title to the office is wanting, namely, the ascertainment and declar-
ation of the result of the election by the two houses in joint con-
vention, and the evidence of such ascertainment and declaration
by the Journals of the Senate and of the House of Representatives.

Having shown that Wade Hampton is not Governor, it follows,
of course, that the pardon which the petitioner here exhibits and
pleads is not valid and cannot be recognized as a pardon by the

Court. Here, then, the case, so far as a decision of the present motion is concerned, ends.

But it may be acceptable to the Court to hear argument upon the further question, Who is Governor? And, if so, we proceed to discuss that question.

Our position is that D. H. Chamberlain, who was elected as Governor in 1874, is now Governor, under that provision of the Constitution of the State which declares that the Governor "shall hold his office for two years, and until his successor shall be chosen and qualified." This Court will undoubtedly take judicial notice of the fact that Governor Chamberlain was de jure Governor of the State from December, 1874, to December, 1876. It is, of course, known to the Court that Governor Chamberlain has claimed and does claim to be Governor under the election of November 7, 1876, the subsequent declaration of that election by the Senate and the House of Representatives presided over by Mr. Mackey, and his inauguration as Governor in the presence of those two bodies on the 7th day of December, 1876. If argument is desired by the Court upon this latter claim, we shall proceed to present it; but at present we place his claim to the office upon the ground that, if his claim under the recent election is invalid, he is still Governor under the constitutional provision just quoted.

This position and the reasoning which supports it may be stated briefly as follows: The constitutional tenure of this office is for two years and till a successor shall be chosen and qualified. If, as is now assumed, Hampton is not Governor by reason of fatal defects in his title, and if Chamberlain has acquired no valid title under the recent election and his attempted inauguration and qualifica- tion, then the title of the former incumbent has never been affected, and he, of necessity, remains de jure as well as de facto the Governor.

His Honor Judge Carpenter, in his judgment in the case of Ex Parte Peter Smith has fully sustained this doctrine, and has sup- ported it by peculiarly cogent reasoning. After stating what is the truth, that the authority relied on in the argument of the coun- sel for Parmele has never been sanctioned by the Courts of Eng- land or America, Judge Carpenter thus forcibly states and disposes of this claim:

"What reason can be adduced in support of the proposition? Is not its statement a solecism? An act without legal efficacy, validity or binding force, conferring no authority, in law null and

void, by some legal legerdemain becomes suddenly possessed of life and vigor! Powerless to confer a right, it is potent to destroy those already existing. Adding nothing, it subtracts all. Ineffectual to support the slightest claim, it is effective in dispossessing a citizen of an admitted legal possession. My reason revolts from a conclusion so illogical and unreasonable. An act void for one purpose is invalid for all. This is one of the cases in which the law overrules the intention of the individual and renders ineffective and futile his expressed will; and, being ineffective for one purpose, it is so for all purposes."—Broom's Legal Maxims, 669.

We do not regard further examination of this position strictly necessary, but a more elaborate presentation of it has now been made to this Court in a printed argument entitled "*In re* application of Peter Smith, &c.," and it seems proper to examine that argument and test its validity.

The argument referred to presents four grounds upon which it is claimed that Governor Chamberlain's inauguration on the 7th of December terminated his tenure of the office of Governor under his election in 1874. These grounds are:

1. That his recent inauguration was evidence of his intention to resign his former title and must be regarded as having that effect in law.

2. That, irrespective of intention, the act, as the acceptance of an incompatible office, operates as a resignation in law.

3. That his act was a resignation or surrender according to certain legal analogies.

4. That his act must be regarded in the light of a legal estoppel

In controverting this argument, it is to be said, at the outset, that no precedent, not one adjudicated case, is presented or can be found in which the doctrines relied on in this argument have been applied to such a case as the present one—a case involving the right to a public office held under a title running indefinitely or until a successor is chosen and qualified. The argument rests wholly upon an effort to apply various doctrines of law, by analogy, to this case.

(*a.*) The cases and authorities cited under the first head of the argument referred to go wide of this case in every instance. In a condensed statement those authorities tend to support the following points:

1. That a resignation is a *renunciation*.

2. That such resignation need not be in any form of words, but may be by parol.

3. That acts are as effective as words to effect a resignation.

4. That any civil office may be vacated by the act of the incumbent.

5. That a formal refusal to hold an office conferred or a formal disclaimer would be a resignation.

6. That the acceptance of another separate and incompatible office is a resignation of the former office, without regard to the intention.

The above statement comprises every point covered by the authorities cited. What application have they to the case in hand?

What is the question involved in the present case? It is this: Conceding that Governor Chamberlain's recent inauguration is wholly void and ineffectual to confer a new title, has it still had the effect to divest him of his former title, which clothed him with his office until his successor should be chosen and qualified?

To establish a negative answer to this question, it is not necessary to dissent from any of the points above stated in the opposing argument. We do not deny that Governor Chamberlain could have resigned his office either in words or by parol or by acts. We do not deny that a formal refusal to accept the office or to act under it, or the acceptance of another incompatible office, would be a resignation in law. But the present is. not such a case, and we beg the Court to notice the essential difference here—a difference in legal principle and effect which is wide and essential. In this case the postulate or concession of the argument is that the act or acts which Governor Chamberlain has done are void, null, nugatory. If he had tendered a formal resignation in writing,—if he had announced his resignation in terms by parol,—if he had refused to longer act under his former title,—or if he had accepted another and incompatible office, the case might be covered by some of the authorities cited. But he has done none of these things. He has simply made a claim of a new election to the same office, proceeded to the ceremonial of an investiture of that office under a new title. By the hypothesis of the present argument, this ceremonial of investiture is wholly void because no right to such new title existed. Now, where does this leave him? On what ground or principle is this act to be accounted a resignation of his former office and title? Did he intend to resign by this act? It certainly

cannot be affirmed that such was his conscious intention in his own mind. The probability, if not presumption, is the other way. The only evidence, in either direction, of his intention is found in his act, and that act is now conceded in this argument to have been in law meaningless and void to accomplish the purpose for which it was intended. If by spoken or written words, if by a formal disclaimer or rejection of his title, he had evidenced his intention to lay down the office he then held, or if, by the acceptance of an an incompatible or disqualifying office, he had in law vacated his former office, the argument of opposing counsel might prevail. Here, however, he had simply done an act, and that act is void and nugatory.

Now, in law a man is held to intend the *natural* consequences of his acts. It will not be contended that the *natural* effect of Governor Chamberlain's act was to relinquish his former office, for there is no evidence, aside from the act itself, that he intended this result.

But it is said every man is presumed to know the law, and he must, therefore, be presumed to have intended to accomplish the *legal* effects of his act. The legal effect of his act is *nihil*. It produced no effect. It conferred no title. It wrought no change. It devolved no office. *And, therefore, by irresistible logic, it took away no rights, but left him precisely where he stood the moment before he did the act, to wit,* Governor by virtue of the failure of *a successor.*

That Governor Chamberlain believed he was acquiring a new title to the office of Governor by his act is not denied; but that he intended to abandon a former title, or that he intended to make his choice between two titles, does not appear by the act itself and cannot be inferred as a legal inference. He must be held to have intended only the legal effect of his act. Governor Chamberlain, in submitting to the ceremony of his recent inauguration, must be held to have said not that "he had abandoned all right which he had to the office by virtue of the clause of the Constitution" now in question, but that he believed he was entitled to a new term of the same office, and intended to assert that claim without in any manner affecting his former title. In other words, he put his new claim to the test; if it failed, as by the hypothesis of the present argument it did, then he still retained his former title unimpaired.

(b.) The second position assumed in the argument which we are now examining is that Governor Chamberlain's act, irrespective of his intention, operated as a resignation, because it was the acceptance of an incompatible office.

This position requires but slight examination. It proceeds upon— we say it respectfully—a singular confusion of ideas. The argument assumes that Governor Chamberlain's recent inauguration gave him no rights, conferred on him no title, and yet with the next breath asserts that he did on the 7th of December last assume and take upon himself a new and incompatible office, and that this assumption and possession of a new office or new term of office operates as a resignation of the former one. Now, need it be repeated, that if Governor Chamberlain's recent inauguration was void, it conferred no title, no new office, no new term? He was, therefore, never in possession of this asserted incompatible office or term.

It will be found that in every case where the doctrine of incompatible offices has been applied the second office has actually been assumed and possessed. *Never has the attempted assumption of an incompatible office been treated as working a resignation of a former office.* No such case, we venture to think, can be found among the innumerable precedents in English and American law. The "incompatibility" of which the law takes notice must actually exist. The "incompatible" office must have been actually assumed. [We shall notice hereafter the argument attempted to be drawn from the acceptance of a new *lease* while a former one is unexpired.]

We do not regard it as necessary to the support of our position to controvert the distinction drawn by the argument which we are answering between incompatibility arising from inconsistent "powers and duties" and inconsistent "titles." Upon either ground of incompatibility the result is the same, namely, that the incompatibility can never arise unless the two offices or two titles actually coexist. If the attempted assumption of the second office or title is void, the incompatibility never exists, and the consequent resignation of the former office or title never takes place.

The case mainly relied on in the argument of opposing counsel is that of *People* vs. *Carrique*, (2 Hill, N. Y., 98). Let us examine that case. It is stated in the argument of opposing counsel that this case was one " in which the defendant, who had been a Justice of the Peace under a certain Act, had been *elected* to a *similar*

office under a subsequent Act, and was sought to be prevented from acting under his first title upon the ground that he had accepted office and been sworn in under the subsequent Act."

This is, to say the least, a singularly inexact statement of the case, and the statement seems to have been constructed with the view of conveying to this Court the impression that this was a case involving a conflict of titles in the same person to the same office. An examination of the case will show a wholly different case and state of facts. The facts were these : Carrique, the defendant, was, under the Act of 1822 establishing a Court called "the Justices' Court in the city of Hudson," appointed as one of the three Justices of such Court. He qualified and entered upon the duties of this office May 1, 1836, and continued in this office till March 13, 1840. On the 23d of January, 1838, he was also appointed, (not *elected*,) under the Act of 1830, which provided for the appointment of *two additional Justices* of the Peace in and for the city of Hudson, one of the *two additional Justices of the Peace* for that city, and entered upon this latter office January 26, 1838, and continued in this office till March 13, 1840, on which day Whiting, the relator, was appointed and commissioned by the Governor a Justice of the Peace in the place of the defendant, *under the Act of* 1830. Information in the nature of a *quo warranto* was brought on the relation of Whiting against Carrique for usurping the office of *Justice of the Peace*.

These facts show that the case involved, *first*, the question of the right of the same person to hold *two distinct and separate* offices at the same time—the one office being a "Justice of the Justices' Court," and the other "a Justice of the Peace" for the city of Hudson—offices separate and distinct in their creations, duties, powers and emoluments. *Second*, the case involved no question of the validity of the title, appointment or qualification of Carrique to his second office as Justice of the Peace. On the contrary, the Court (Cowen, J.,) says expressly : "The appointment (of Carrique) of 1838 *was valid*, the acceptance *rightful*, and *the defendant must be held as rightfully holding his office under the Act of* 1830." Two questions were made by the Attorney General : 1st. That the defendant's title was void because he "held the incompatible office of a Justice of the Justices' Court." 2d. That the appointment of the relator, Whiting, was in itself a removal of the defendant.

Upon the first question the Court held that the appointment and acceptance of the new office under the Act of 1830 was valid, and its effect was a resignation of the former office of "a Justice of the Justices' Court," and then added: "It becomes unnecessary, there-fore, to decide whether the two offices were or were not incompati-ble. If they were, the disqualification was removed by an accept-ance of the new office; if they were not, then there was not even a qualified disability." Judgment was accordingly given on both issues raised for defendant.

Now, we respectfully ask this Court to what point the authority of this case goes? And we answer that it goes, beyond controversy, to this precise point and no other: that the valid appointment, the rightful acceptance and the rightful holding of a new and incom-patible office are, by legal implication, a resignation of the former office and an election to accept the new office.

It was not a question of the incompatibility of two terms of the same office, but of two distinct and different offices. More than this, the case proceeded expressly upon the judgment that the new office was fully acquired and actually held by Carrique under a valid appointment thereto.

Suppose, now, that in this case it had appeared, either by admis-sion or otherwise, that Carrique's appointment under the Act of 1830 was void—that he never actually possessed the office, either by defect of power in the appointing power or by defect of qualifi-cation by the defendant,—what may we conclude would have been the judgment of the Court?

We submit that it would have been that Carrique, having never held the second office, had never vacated or resigned his former office.

The case of *People* vs. *Metropolitan Police Board*, (26 N. Y., 316,) is also much relied on in the argument of opposing counsel to sus-tain several of his positions. The case has, plainly, no application to our present controversy. It was an appeal from the judgment of the Supreme Court in *mandamus*, and is thus stated and decided by the Court, pp. 320, 321: "More than two years after the Metro-politan Police law took effect, under the pretext that he was a member of the city police at the first meeting of the Metropolitan Police Board, and by operation of law transferred to the new force, and never having resigned or been legally dismissed, he invokes the mandate of the Court to restore him to the office of patrolman and

permit him to enjoy its emoluments; and this, though he has per-
sistently refused to take or hold, and has never taken or held, office
as a member of the Metropolitan Police, or under the Board estab-
lished by the Act; has withdrawn from such police force and dis-
claimed holding any office or doing any duty as a member of the
force of the Metropolitan Police district, and has since the passage
of the Metropolitan Police Act, for his private gain, entered into
other employments, in no wise connected, but inconsistent with his
duties as a member of such force. This is the case of the relator
as shown by the record." The judgment below for relator was
accordingly reversed and judgment ordered for defendants.

Neither the facts of this case, nor the judgment of the Court, nor
its reasoning, lend any support to the argument of counsel on the
present issues.

The case is put in the argument of opposing counsel of the in-
auguration of another person than Governor Chamberlain on the
7th of December "to whom he has yielded the office," and it is
asked whether, if it were subsequently ascertained that the newly-
inaugurated person was not lawfully inaugurated, Governor Cham-
berlain would again be entitled to enter upon his office.

Our answer is, that in such a case the actual incumbent would
ordinarily be treated as the *de facto* officer and his acts regarded as
valid; but if it should be judicially found that he was not entitled
to his office, and judgment of ouster rendered, it would of necessity
revert to the person who was *de jure* entitled to hold the office.
If such were not the case, the office would be vacant.

(*c.*) The third position in the argument to which we are now
replying undertakes to establish the doctrine for which it contends
by a reference to analogies drawn from the surrender of leases.

In order to lay some apparent basis for such an argument, an
effort is made to assimilate leases to public offices in respect to the
law governing them. References are made to Roman and English
law to establish the position that the tenure of offices as well as
and was held from the lord or sovereign.

It is enough to say, in answer to this, that offices are not created,
devised or held in any such way in this country. The idea and
form of appointment to public office in this country is radically
different from the feudal idea and form.

"Public offices are not held by contract with the government,
nor are they the property of the incumbents."—*Conner* vs. *City of
New York*, 2 Sandf., 355.

"Public offices are not incorporeal hereditaments, *nor have they the character or qualities of grants.*"—*Conner* vs. *Mayor of New York,* 1 Seld., 285.

But conceding, for the purposes of argument, that the law of leases can be applied to the present case, we take issue with the position of counsel that the taking of a new lease by a lessee whose term has not expired is a surrender of the first lease even when the latter lease is void.

We agree entirely with His Honor Judge Carpenter in his decision in the case of *Ex Parte* Smith, where he says: "The case of *Mellows* vs. *May,* cited in Bacon's Abridgment, vol. 5, p. 663, was relied on, where it is stated that 'if one be lessee for life or years, and take a new lease of the same lands, though such lease be void for any defect in the making or execution of it, as if it were for life to begin at a future day, yet is a surrender of the first lease.' In a note on the same page, it is impliedly asserted that this case was erroneously reported. If it ever was law in England, the case has long since been overruled. 'No surrender, express or implied, in order to, or in consideration of, a new lease would bind, if the new lease is absolutely void; for the cause, ground and condition of the surrender fails.'"

Lord Mansfield, in *Zouch* vs. *Parsons,* 3 Burrows, 1807; *Wilson* vs. *Sewell,* 4 Burrows, 1980: "So far as my examination of the authorities extends, this doctrine has been sustained by all the British Courts since that time, and I think, notwithstanding the case of *Mellows* vs. *May* has in a few cases been approved by some American Courts of undoubted learning and ability, the preponderance of authority in this country is largely adverse to the ruling said to have been made in that case. It is perhaps not unworthy of remark, that most of the cases in which the doctrine laid down in Cro. Eliz., 873, has received commendation arose upon a very different state of facts, and the references thereto were illustrative of some supposed analogy, rather than cited as an authority in point."

The opposing counsel seeks to controvert the conclusions of Judge Carpenter by citing the case of *Van Rensselaer* vs. *Penniman,* (6 Wend., 579,) and lays special stress upon the case on account of the distinguished character of the Court for learning and ability. We dissent from nothing said in praise of the Court, but we think it due to the memory of the men who composed the Court, and as

a vindication of their high claims to the consideration of the pro-
fession and the bench of this day, that we should relieve them
from the construction put upon the case by the opposing counsel.

The facts of the case were that, the ancestor of the plaintiffs being
seized as tenant in fee-tail of an estate, leased it to one Cuyler in
1776 for three lives, with a covenant that if the heirs at-law, or any
other person, should dispossess the tenant Cuyler he should pay him
for improvements.   Subsequently the lessor died, declaring by will
that, as the Legislature had abolished *tenancy in tail,* he devised the
said estate to his grandson and his heirs-in-fee.   The grandson took
the devised estate subject to the lease, and in 1796 executed a new
lease to Cuyler of the *same premises,* for the *same lives,* at the *same
rent,* and with a covenant to pay for improvements at the expiration
of the lease if his heirs, or other persons having authority, should
remove or dispossess Cuyler or his heirs or legal representatives.   At
the expiration of the three lives a controversy arose as to whether
payment should be made for improvements made during the *two*
leases or only during the last lease, the estate having been conveyed
under decree in partition between the heirs of Cuyler, in 1826, to
Penniman, the defendant.   The controversy resulted in an action
of ejectment.   The Court, in deciding the case, after saying that the
principal question was whether the acceptance of the second lease
was a surrender of the first, and after stating the general doctrine
upon the subject, held "that if the acts of the parties, taken
altogether, are such as to rebut the idea of a surrender, *then none
ought to be presumed,* * * *  and that in this case every circum-
stance, except the fact of receiving the second lease, altogether re-
buts the idea of an intention to surrender the right to compensation
for improvements," * * * and finally *held* that *no surrender was
made or implied in receiving the second lease.*

This is the actual decision in the case of *Van Rensselaer* vs.
*Penniman,* a case cited with great emphasis to establish the posi-
tive and absolute doctrine that the simple acceptance of a second
lease works a surrender of the first!   The true doctrine of the case
is that the acceptance of a second lease may or may not work a
surrender of a former lease; that this depends on the intention of
the parties, and that this intention is to be gathered from all the
facts of the case.

Nobody could well dispute these doctrines.   It amounts to say-
ing that a person may, if he chooses, surrender a former lease by

taking a new one, but that in order to accomplish this result he must have intended it, and must have evidenced his intention by his acts.

In quoting from the general statements of law which form the first part of this decision, the opposing counsel, as will be seen by inspecting the printed argument, states as follows: " And this," proceeds the case above cited, "is the consequence, *although the second lease should be void."* [The italics are not ours.] The sentence as it stands in 6 Wendell, 579, is as follows: "And this is the consequence, although the second should be void *for any cause other than the want of authority in the lessor."* [The italics are ours.] And this sentence is followed by these words: "As this presumption of a surrender arises from the acts of the parties which are supposed to indicate an intention to that effect, it must follow that where no such intention can be presumed, *without doing violence to common sense,* the presumption cannot be supported."

It is now respectfully submitted that the case of *Van Rensselaer* vs. *Penniman,* when correctly stated, lends no support to the case of *Mellows* vs. *May,* but, on the contrary, makes the whole question one of intention to be gathered from the acts of the parties and not at all a rule of absolute law.

But there is, to speak plainly, a practical absurdity in endeavoring thus to assimilate the case of taking a new title to office and taking a new lease to lands.

In the present case, who are the parties, lessor and lessee? It may be answered, the State is the lessor and Governor Chamberlain the lessee. If this be granted, what new lease has the State executed? How has she evidenced an intention to grant a new lease? If this is a case of lessor and lessee, the act of the lessor in making a second lease must be clear and undisputed. If that fact does not exist, or cannot be shown clearly, then one of the conditions of the doctrine in question is wanting, namely, the execution of a new lease. If this Court does not find, in point of fact, that a new lease was executed in *form,* at least, then no application of the doctrine in question is possible. If the lessee assumes that a second lease has been executed by the lessor, when, in fact, none has been executed, this assumption does not create a lease or put it in the power of any one to say that a lease has been executed.

But it may be well to bring the present case to the clearest possible comparison with the case of a lease of lands and test the doc-

trine in question. If, then, A had granted to B a lease of lands for two years, and until the lessor should execute a new lease of the same lands to another person, and that person had actually entered under the new lease, and if B, at the expiration of the two years, should understand from the acts of A that a new lease of the same lands had been executed by A to him, and under this belief should accept such a new lease, and it should afterwards be declared that such second lease had never been made or was void, we should have a case as nearly analogous or identical with this case as could perhaps exist in the case of leases. Now, is there anywhere a respectable legal authority which would hold that under such a state of facts a surrender by B of his former term was intended or could be enforced? The case of *Van Rensselaer* vs. *Penniman* would certainly be strong authority to the effect that under such circumstances no surrender was intended or effected.

(*d.*) The last position taken by counsel in support of his doctrine that Governor Chamberlain cannot claim to hold under his former title is founded on the law of estoppel. This is another of the analogies attempted to be applied to this case. Here again it is noticeable and highly significant that no case can be cited in which estoppel has ever been applied to conflicting claims to public office.

The law of estoppel may be searched from beginning to end, and no case will be found of its application or use in any case except such as involve the *rights of property*. Office, public functions, are not *property* in this sense. No man has a real or personal estate in a public office. A public office cannot be acquired by gift, grant, inheritance or devise. It cannot be bought, sold, aliened, rated or farm-let.

"If the idea of property cannot attach to the power appertaining to a political office, neither can it attach to the obligation that results from the possession of such political power. Such an idea is inconsistent on its face, for if any one has a property in an obligation, it is not the one who is bound by the obligation, but he who may enforce it."—*Alexander* vs. *McKenzie*, 2 S. C., 93.

But if the subject matter of the present case were one to which the doctrine of estoppel could apply, there is no relation of parties here which would permit its application.

This may be seen by considering the very definition of estoppel.

"The very meaning of estoppel," says Herman, "is when an admission is intended to lead, and does lead, a man with whom a party is dealing into a line of conduct which must be prejudicial to his interest, unless the party estopped be cut off from the power of retraction."—Herman on Estoppel.

"Estoppels *in pais* can only arise when the conduct of the party estopped is fraudulent in its purpose or unjust in its results."—*Ibid*, 335.

"When an act. is done or a statement made by a person which cannot be contradicted or contravened without fraud on his part and injury to others whose conduct has been influenced by the act or admission, the character of an estoppel will attach."—*Ibid*, 338.

"Estoppel *in pais* cannot arise without proof that wrong has been done or is threatened on one side, and injury suffered or justly to be apprehended from it on the other, nor unless the injury is so clearly connected with the wrong that it might and ought to have been foreseen by the guilty party."—*Ibid*, 339.

Treating, then, a public office precisely like a piece of land, for the sake of this argument, it must appear, in order to create an estoppel, that one party has acted with the intention of misleading another party, and has actually misled him into a course of conduct injurious to his interests, and that this wrong or injury ought to have been foreseen by the party estopped. Now, we ask, how is such a doctrine to be applied to this case? Who are the parties here to whom this doctrine is to be applied? So far as the present record shows, Governor Chamberlain is not a party at all. The only parties who appear in any relation in this record are the petitioner, the Superintendent of the Penitentiary, and Wade Hampton. Governor Chamberlain does not appear as an actor.

But suppose the case was that of Peter Smith, who pleads and exhibits a pardon signed by Governor Chamberlain. How is estoppel to be applied in this case? Whom has Governor Chamberlain misled? Whom has he intended to mislead? What action or conduct has any one taken in consequence of Governor Chamberlain's action which has resulted in his injury? If Wade Hampton is to be regarded as a party in interest here, has he been misled by Governor Chamberlain's inauguration? Has he waived or renounced any rights or acted to his own injury in consequence of that inauguration? It would hardly seem so, inasmuch as only one week later he himself assumed to claim the same office, the same title, and to be inaugurated under his claim of election.

Has the Superintendent of the Penitentiary been misled to his injury by Governor Chamberlain's claim to be Governor under his recent inauguration? He has not recognized his action under either his former or his second claim or title.

The case is put by opposing counsel of an action of false imprisonment by the petitioner against the Superintendent. Does anybody imagine that in such a case the plea of estoppel would be or could be made? Governor Chamberlain would in no sense be a party to such an action, nor would his acts or recitals be admissible, except as they appeared on the face of the pardon.

The more the effort is made to apply the doctrine of estoppel to such a case as the present, the more impossible it will be found to make the application. If estoppel could be applied anywhere, as to any of the parties interested in this case, it would be as between Governor Chamberlain and his grantee, the petitioner. Some analogy might possibly be urged in holding that Governor Chamberlain was estopped from denying his own pardon when it was pleaded by one to whom he had granted it. Even in that case he would only be estopped from denying that he was Governor when he granted the pardon, and not from denying the one or the other title under which he might claim to hold that office.

Estoppel has, therefore, no possible application to this case: First, because estoppels are never applied or enforced except as to *rights of property;* and, second, because there is no party setting up an estoppel who would be, under any circumstances, entitled to plead it.

The foregoing argument has been addressed mainly to establishing: *First,* that Wade Hampton is not Governor; and, *second,* that Chamberlain is. It has been shown that the fact upon which the title to the office is made by the Constitution to depend—the fact of having received "the highest number of votes"—has never been ascertained in Hampton's case in the manner required by the Constitution, and that that fact cannot to-day be asserted upon the basis of any competent official, legal or constitutional canvassing of the votes. If it is believed to be a fact, it has never been ascertained to be a fact, so as to lay the basis of title to office.

It has been further shown that Governor Chamberlain's former title has not been impaired or cut off by his recent inauguration, because, upon the theory of this argument, that inauguration was wholly void and nugatory.

In conclusion, there remains another question, to wit: whether Governor Chamberlain's recent inauguration, and the claim of title on which it was based, is valid or not? That question I do not feel inclined to discuss, unless the Court shall indicate its wish to hear argument upon it.

*Barker*, in a case in which John Pelton was the petitioner, and in which the questions were the same as in the Tilda Norris case, filed the following argument:

May it please the Court, the third proposition of counsel for petitioner is "that if neither Wade Hampton nor D. H. Chamberlain has been legally installed as Governor, is not Chamberlain Governor by virtue of his holding over under his old title, acquired by the election in 1874, which made him Governor until his successor is elected and qualified?"

This proposition has been fully and ably met by Mr. Maxwell, who has shown, by principle and upon authority, that Chamberlain's former title, under which he might have elected to hold over, has been surrendered in law by his attempted inauguration, which, though invalid to give him a new title *de jure*, is sufficient, as a declaration of claim under a new title, to terminate absolutely his old tenure and estop him and those claiming under him from setting up his old title as authority for his acts as Governor. Had he not done so, he might (until the inauguration of Wade Hampton) have held a good title. He has simply surrendered a good title and put it beyond his reach by attempting to clothe himself with another and inconsistent title.

I will only cite a few additional authorities on this branch of the case:

"The term 'surrender by operation of law' was said by Parke, B., in delivering the judgment of the Court, to be properly applied to cases where some act has been done by or to the owner of a particular estate, the validity of which he is estopped from disputing, and which could not have been done if the particular estate continued to exist. The law there says that the act itself amounts to a surrender." * * * * (2 Smith's Leading Cases, 614.)

The point has been expressly decided in South Carolina in the case " *Ex Parte* Gray."—Bailey's Equity, 77. * * * * *
"In this case," says Colcock, J., delivering the opinion of the Court, "I am of opinion that the respondent, by having become

.a candidate for the office, under the terms prescribed by the Act had voluntarily resigned all right to the first term, and could not now claim the office."     *     *     *     *     *     *     *

"It is said that the doubts of the respondent were stated and some objections presented at the first election; but he nevertheless entered the lists and was voted for as a candidate for the office, under the limitation fixed by law, and actually held the office. In Jacob's Law Dictionary, title 'Surrender,' the law which I think applicable to this case is collected. 'The surrender at common law,' it is said, 'is the usual surrender, and is of two sorts, viz.: A surrender in deed, or by express words in writing, where the words of the lessee to the lessor prove a sufficient assent to give him the estate back again; and a surrender in law being that which is wrought by operation of law, and not actual, as if a lessee for life or years take a new lease of the same land during the term, this will be a surrender in law of the first lease.' 'And this surrender in law, by taking a new lease, holds good, though the second lease is a voidable lease.'—5 Rep., 14; 6 Rep., 69; 10 Rep., 67; 1 Inst., 218; Cro. Eliz., 873.     *     *     *     Dillon on Municipal Corporations, 200; 3 Hill N. Y. Rep., 243; 16 Johns. N. Y. Rep., 28; Bacon's Abridg., vol. 5, pp. 657, 662."

The only other grounds upon which the attempted pardon can be contended for are the claim of Chamberlain, as grantor thereof, to the office of Governor by virtue of or under color of the election on Wednesday, November 7, 1876.

It has not been maintained in the opening argument, and we have had the benefit of no authorities on the point, though it is made in the answer, that D. H. Chamberlain claims to act as Governor *de facto*, and we presume it will be relied on in reply.

We deny that Chamberlain has *de jure* title either by holding over or by virtue of election in 1876, or that he is *de facto* Governor.

In *Wilcox* vs. *Smith*, (5 Wend., 231,) it was held "to constitute an officer *de facto*, a mere claim to be a public officer and exercising the duties of the office are not sufficient; there must be some color of right or an acquiescence on the part of the public for such length of time as will authorize the presumption of, at least, a colorable election or appointment."

In *Kimball* vs. *Alcorn*, (45 Miss., 151,) it is said: "To constitute an officer *de facto*, there must be a color of right by election or

appointment, or an acquiescence by the public for a length of time which would afford strong presumption of legal right. The incumbent himself has no privileges and is shielded from no responsibility. If he attempts to enforce a right grounded upon and flowing out of his office, his title is put in question, and he must show a legal right. So, where he justifies it, there is much and respectable authority to the point that it is not enough to show that he is in office by an appointment which is irregular or that the State has for a long time acquiesced, but he must prove a legal right."—5 Watts, 539; 7 Johns.; 9 Johnson, 135; 2 Swan, (Tenn.,) 135; 2 Head, (Tenn.,) 586; 2 Metc., (Ky.,) 494; *People* vs. *Tiernan,* (30 Barb.) To constitute a person an officer *de facto,* a mere claim to be such officer and exercising the duties of the office are not sufficient. It is well settled that there must be color for the claim and a colorable title to the office.—*People* vs. *White,* 24 Wend., 520; *People* vs. *Peabody,* 6 Abbott, 234. As was said by the Supreme Court of Connecticut, "an officer *de facto* is one who exercises the duties of an office, under color of right, by virtue of an appointment or election to that office."—*Rochester and G. V. R. R. Co.* vs. *Clarke National Bank,* 60 Barb., (N. Y.,) 234. "When color of authority notoriously ceases, the reason for sustaining their acts as the acts of officers *de facto* ceases."—*King* vs. *Corporation of Bedford Level,* 6 East., 356; *Rex* vs. *Verelet,* 3 Campbell, 432; *King* vs. *Lisle,* 2 Strange, 1090.

In the case of D. H. Chamberlain, the claim to the office by virtue of the election of November 7, 1876, is accompanied by the notorious fact that on the face of the returns another was elected, and that the declaration of him as Governor was a false statement of the result of the vote made by a notorious illegal body, so adjudged by the Court. There is against his claim of title, by mere possession of the furniture of the Executive Chamber, (in which he is sustained against law by armed force,) the fact of a person claiming to be Governor who has received the highest number of votes according to the face of the returns and against whose *prima facie* title no protest has been presented. There is also a denial of the claim of Chamberlain from the first assertion of it, a constant protest, and no acquiescence by the public, and the notorious illegality of the declaration upon which he bases his assertion of claim. Either of these facts are sufficient to rebut any presumption or color of title under the election in November.

In South Carolina it has been held in *Kottman* vs. *Ayer*, (3 Strob., 94,) "the acts of a King *de facto* are as binding as if he were in office by legal right, so long as those whom he governs acquiesce in his exercise of power. I do not undertake (says Evans, J.,) to say that in an organized state of society, under a regular government, the acts of an usurper, of one who obtrudes himself into an office, without color of claim, would be binding; but where the electing or appointing power has conferred the office upon him, and he is in the actual discharge of his duties without his title being questioned in any legal way, the community in which he lives have the right to regard him as a legal officer, and his acts as to them will be valid. * * * To entitle one to claim the emoluments of an officer or the privileges conferred by it, he must show, if his right be questioned, that he is an officer *de jure*, as in the case of *Allen* vs. *McNiel*. One claimed prize money as an officer, It was held he must prove himself such. His having acted would not be sufficient, where his being an officer is the very gist of his action. * * * But (except in the first class of cases, where the right claimed depends on the fact that the party is an officer,) it would seem from the cases that the presumption of the legal right to an office arises *prima facie* from the actual discharge of its duties. But this is a rebuttable presumption, and its effect is destroyed by proof to the contrary."

We contend, on authority, that the presumption of legal right, as holding over, which might have arisen from the actual discharge of the duties of the office by D. H. Chamberlain is fully rebutted, and its effect is destroyed by his declaring himself Governor under a new and inconsistent title by the election in November, and that the presumption of legal right under color of election under the declaration of the Mackey House never arose. Chamberlain claims the office under the recent election, through a chain of frauds and illegality which destroys any presumption of title. The petitioner who sets up in the pardon his grant, or attempted grant, is compelled by the very evidence of his grantor's pretended induction into office to admit here that Wade Hampton had, by the returns of the election, the highest number of votes. The Constitution declares that he who has the highest number of votes shall be Governor. How do they claim that the election of Governor Hampton is set aside? By showing successive acts of persons assuming to be public officials, done in defiance of the Constitution and the

judgment of the highest Court in the State. No proof is produced of a protest before the Legislature; none of an examination of such protest; no witnesses summoned; no day appointed; no decision showing by the proper tribunal that the votes cast for Wade Hampton or his majority over Chamberlain were illegal. Upon the action of the Mackey House alone rests D. H. Chamberlain's claim to be Governor *de jure* or *de facto.*

I regard it as a happy accident, because it disposes of the most of the false structure of title claimed here, built upon *the declaration* of Chamberlain's election by the Mackey House, (the Senate concurring;) that the Constitution does not say that he is Governor who shall be *declared* to have received the highest number of votes, but says: "*He who has the highest number of votes shall be Governor.*" In the very next sentence it provides how, in case of a contest of the election, such contest shall be decided.—Constitution, Art III, § 4.

We assert, then, by the light of this language, as grand as it is simple, that no *declaration* of a lawful House (still less a Mackey House) or of a General Assembly contrary to the face of the returns can set aside the will of the people there expressed. Nothing can legally change such a result but a decision upon a contest tried according to law. When, therefore, Chamberlain or his grantee admits, as is here admitted, that Hampton had on the returns the highest number of votes and shows no contest, it is an admission in law that Hampton *is* and that Chamberlain is *not* Governor.

The process by which the declaration of Chamberlain's election was reached, through a pretended count of the vote, was by throwing out, by a vote of the Mackey House, (a majority of the Senate concurring,) the entire votes of two Counties of the State. The precedent or authority for this revolutionary proceeding is not shown and cannot be. Its justification is the mere will of the persons who assumed to act as the House of Representatives and of the majority of the Senators conspiring with them.

It is claimed that the Mackey House was legally organized. This has been decided by the Supreme Court of this State to the contrary, and yet the effort is made here to discuss the whole question *de novo,* as if it had not already been discussed fully and decided finally. It is said that the Clerk of the former House, (Jones,) who on the 28th of November called the roll of the House

of Representatives, had a legal right to omit Edgefield and Laurens from the call, because the certificate of *members returned elected*, based upon the certificate of the Board of State Canvassers, which the Clerk (Jones) had from Hayne, Secretary of State, did not contain names of the members elect from Edgefield and Laurens. That Secretary of State, that Clerk of the former House, and every man who participated in the proceedings of that body on that day, had legal notice that, under the Constitution, there could be no House not composed of fully ·124 members elect from thirty-two Counties in the State; that no certified determination of a Canvassing Board, no certified list of Secretary of State and no roll of members could be complete or legal which omitted two Counties. They had further notice that that particular certified determination of the Canvassing Board was illegal, false, in fraud of law, and made in disobedience and contempt of the Supreme Court. They and each of them had further notice of the judgment of the Supreme Court, based upon the true returns of said election, deciding that five members elect from Edgefield and three from Laurens were entitled to seats in the House and entitled to participate in the organization .thereof. In disregard of the law, they proceeded to make a false and illegal roll call, omitting Edgefield and Laurens from the roll and from the call.

This was the first step in the bold defiance of law, the crowning act of which was the inauguration of D. H. Chamberlain. If, as is asserted, it was the legal duty of the Clerk of the former House to call the roll, and the Secretary of State sent him a false roll, it was his duty to return it and demand its completion according to law. Such would have been his course unless he intended to assist in the plot which was afterwards developed. Proceeding, then, upon the principle *not* recognized by the Constitution, viz., *that the majority of persons returned to them from the Secretary of State's office* was a legal quorum, competent to do business under the Constitution,—instead of sixty-three, a majority of 124 members,—and, having organized on this basis, they go on to elect a Speaker of the House of Representatives. E. W. M. Mackey, the historical personage, who will live in the story of the State's dishonor, is the party who advances now to the footlights. He is elected by a majority of the illegal body. He is the party put forward as the pretended Speaker of the pretended House of Representatives. It was at that point in the history of this conspiracy that proceedings

were taken in the Supreme Court, on the part of *William H. Wallace* vs. *Hayne*, as Secretary of State, and *E. W. M. Mackey*. Having demanded the returns, in accordance with the Constitution, Mr. Wallace received a reply from the Secretary of State that he had not those returns, and that he had delivered them to E. W. M. Mackey, holding possession of the chair of Speaker in the hall of the House of Representatives, and upon that a rule to show cause on a suggestion in *mandamus* was issued and served upon Hayne and Mackey, commanding them to answer before the Court to the matters and things in the suggestion set forth, and to show cause why the prayer of the relator should not be granted.

In answer to that suggestion, which asserted the title of Wallace as Speaker of the lawful House, and charged the illegality of the claim of Mackey as Speaker, Mackey and Hayne came into the Court and answered, submitting to the Court the question of the legality—the one of his title to the office and the other of his act in delivering the returns. In the case of Mackey the issue was joined upon the distinct question whether a House of Representatives, under the Constitution of South Carolina, composed of 116 members, was a lawful House, and whether a majority of 116 was a constitutional quorum of a lawful House, against the assertion of Wallace that 124 members, under the Constitution, was the only legal House known to the law, and that sixty-three members of such majority was the only legal quorum, and upon the issue so joined the Supreme Court entered a judgment and took cognizance of all the matters affecting organization argued here to-day.

The question of the right of the members elect from Edgefield and Laurens to participate in the organization and the question of their exclusion from that House were distinctly before the Court, and it was there decided, upon the issues made up, that Wallace was the legal Speaker of the constitutional House of Representatives of South Carolina; that there could not be two Houses, nor two lawful Speakers, and, therefore, that Mackey was not Speaker of the House of Representatives, and being, therefore, a mere private individual, was not subject to the particular process prayed for. This judgment became the law of the land, just as in the case of *Marbury* vs. *Madison*, (1 Cranch, 137). The *mandamus* was refused, although all the questions were decided, and it is a leading case in America.

In *Davant* vs. *Essex Company*, (7 Wall., 109,) it was contended "that the decree in the first suit. being simply one of dismissal, did not prevent the filing of a new bill." The Court, however, said: "The decree dismissing the bill in the former suit, * * * being absolute in its terms, was an adjudication of the merits of the controversy and constitutes a bar to any further litigation of the same subject between the same parties. A decree of that kind * * * is a final determination."

In *Hopkins* vs. *Lee*, (6 Wheat., 109,) it was held that "a judgment or decree of a Court of competent jurisdiction is conclusive wherever the same matter is again brought in controversy."

It may be said that this is true only as between the parties to the suit and their privies, but it is a maxim of the law that, as to all questions affecting the public which come before the Courts for decision, the subject matter in issue is not *res inter alios acta*, because in such controversies all citizens of the State are privies.—Broom's Legal Maxims, p. 917.

We claim that this whole reopening here of this question as to the validity of the Mackey House is irregular. That decision is binding upon all the citizens of this State, and that body over which Mackey presided is wholly illegal and unconstitutional and all its actions void from beginning to the end. Its original, essential, fundamental illegality sticks to it and will taint the action of every individual or body acting in connection with it. The taint spreads like a corroding poison and damns forever the action of every public or private person who dares to give it sanction or support.

A feeble majority of the Senators, carried away by the spirit of party or otherwise, united with the Mackey faction, and their illegal conduct is relied on to give sanction and color of title to the claim of Chamberlain. No participation on the part of the Senate with a body of men setting themselves up as a House of Representatives, without title and in defiance of law, can ever remove the taint of invalidity from or give sanction to the action of such a body. The idea of a majority, which is a boast of American institutions, and to which is attributed so great effect, is sacred only when a majority acts within the limits of law; the moment it acts beyond those limits it loses its sanctity and all claim to respect. It is the voice of the Senate and of the Constitution and of the law only when it acts within the obligations of law. It is not the voice of the Senate when it steps beyond the law.

It may concur or recognize, or refuse to concur or recognize, but it is the Senate just so far as its action is in accordance with law. It not only can give no legality but it loses all legality of character itself, and the action of the Senate, upon which they rely here to support this title, is as void in law as it is bad in morals.

On the 5th day of December this Mackey body, so pronounced by the Supreme Court to be utterly illegal, sends a notice to the Senate of its resolution to proceed to a count of the votes for the office of Governor and Lieutenant Governor on the next day. The formula was observed of a joint resolution with this Senate to concur with them in opening these abstracted returns of the election. The resolution which came to the Senate from the Mackey rump came from a treasonable body. The concurrence in that resolution was a mere participation in an illegal act by a majority of that Senate. They concurred with the Mackey body in a resolution to open and count the votes for Governor.

Accordingly, on the day appointed, (this majority of the Senate so concurring with the Mackey body so unlawfully assembled,) the joint conspirators proceeded to open certain returns, the possession of which had been obtained by them, unlawfully, from the Secretary of State, who had, in violation of law, delivered them to Mackey.

These returns were from all the Counties in the State, including Edgefield and Laurens, showing the vote cast for Hampton and Chamberlain. When Edgefield was called, a member of this body objected to the vote from Edgefield being counted. Thereupon the objection was put to the House, and it proceeded to decide the question, and then and there disposed of the entire votes of two Counties of the State, and cast them out of the count without having the case made, no parties notified, no witnesses produced before the proper tribunal by a contest, but of their own motion, outside of the Constitution, the Senate involved with the mock House in the conspiracy, they arrived at a judgment which undertook to decide in this manner that there was no election in Edgefield and Laurens and that the votes cast there were not legal votes.

An *ex parte* unconstitutional determination of an illegal body disfranchises the citizens of two Counties in the State! It throws out Edgefield and Laurens. They little thought that they were then and there destroying all *color of title* in Chamberlain to the

office of Governor *by the election* in November; that they were doing what when brought to the test of law would defeat them. Notoriously they proclaimed to the world that the way in which they proposed to establish the usurper Chamberlain as Governor was by the casting out of Edgefield and Laurens upon the *ex parte* action of an illegal body; and he who should have known the law— he whose reputation, whatever else of name he may leave behind him in South Carolina, will certainly never be denied the claim of an able and astute lawyer,—overcome and blinded by his own intense partisanship or be it what it may which settled down upon and clouded his judgment,—he whose reputation a year ago would have carried him back to his home with the respect at least of a portion of this people,—he puts his hand to the work of treason, and, upon the invitation to him from the Mackey House to come in and be inaugurated, he goes in an unhappy moment to join the others of the band of conspirators in the hall of the House of Representatives, and, in destruction of his record as a lover of right or of law, in the face of his education, in the face of the civilization of which he boasts himself, in defiance of the Supreme Court of this State, in the presence of these men, he flies in the face of the Constitution and the laws which he was there swearing once again to support and defend. In the face of high heaven, which he dared to invoke, he swears himself into the office on the basis of treason ! Title ! Why, may it please the Court, when one sets up the *color of title* to office, and in setting it up proclaims to the world the infamy through which the claim is derived, does it need words to show that that is not, in contemplation of the law, in its purity and justice, *color of title*, but the very opposite—the notorious declaration to the world that he has *no color of title* to the office ?

These facts were made notorious by these very people, and notice of it has been brought home to the Superintendent of the State Penitentiary. He has been notified that Chamberlain does *not* propose to hold office under his old right, nor by virtue of having the highest number of votes, but by the action of this illegal body. Mr. Parmele, if he had recognized this man's attempted pardon, could have been indicted for an illegal escape of the State's prisoner. Even if he, in an action for a negligent escape, could have plead the confusion of the times in mitigation, he could not have been justified, and judgment would have gone against him at least for a technical escape.

We might rest the case here, without going into the question of Hampton's claim. His acts as Governor are not here called in question. But we shall not shrink from the issue, whether it be pertinent or not to this case.

We rest his claim upon the position that Hampton received the highest number of votes on the face of the returns. The other side has admitted this, and we claim the benefit of this admission. The fact, accompanied by the absence of any proof of a contest made against the face of the returns, stands as title *de jure* by force of the words of the Constitution itself: " *He who has the highest number of votes shall be Governor.*" It is like a judgment, demanding obedience of Courts and all persons in the State.

But it is said that there was no *declaration* of Hampton's election according to the *forms* of the Constitution, inasmuch as the Senate did not unite with the constitutional House in counting the votes. In reply, we say that, admitting any irregularity or flaw, caused by physical or moral obstruction, to have occurred in the process of ascertaining who was elected Governor, the great fact, being ascertained, (no matter how,) overrides all process or forms, and covers all flaws or irregularities in reaching it.

All the preliminaries pointed out by the Constitution are subordinate to the question which the Constitution seeks by those preliminaries to reach, viz.: Who is Governor? That fact being known and admitted, all other matter, such as the formula prescribed as to opening and publishing the returns in the presence of both houses, &c., ceases to be of any moment whatever on a question of who is Governor. If, for example, Mr. Chamberlain to-day, in justification of his act, could show by the admission of the party calling his act in question that he had the highest number of votes on the returns, and that no contest had been made or decided against him, no flaw or omission in any proceeding by which his election had been ascertained or declared could unseat him. What would, in such case, be true of his title, is, in this case, true of the title of Governor Hampton.

In this case it is admitted by us that when the House of Representatives proceeded to count the votes it was not joined by the Senate in its organized capacity, and it is also admitted that the sealed returns, which should have been opened by Speaker Wallace, were not opened by him in the presence of the two houses.

I deny that either of these omissions, in the letter of the law, invalidate the election or qualification of Governor Hampton. All the directions which precede the sentence which begins with the words: "He who has the highest number of votes shall be Governor," in the Section of the Constitution, constitute *an entire proceeding.* It is not any sort of returns that are to be opened and published in the presence of both houses, but the special returns sealed up by the Managers of the Counties and sent by them to the Secretary of State. If these (or the special substitute for them, the certified copies which, in a certain event, the Secretary of State procures from the Clerks of the Courts,) cannot by any accident or physical or moral cause be opened and published in the presence of both houses, then the whole clause falls to the ground, and with it the necessity of the attendance of the Senate with the House.

I admit that, where the letter of the Constitution cannot be strictly pursued, the highest public duty is to adhere to the spirit and true intent of the Constitution, and, *as near as may be possible,* to the letter and the forms prescribed by the law. This, we contend, was done by Speaker Wallace and the constitutional House of Representatives in ascertaining who was elected Governor.

The original sealed returns, having been wrongfully delivered by Hayne, Secretary of State, to Mackey, and opened by him, the House proceeded to obtain the next highest evidence of the election. Certified copies from the Clerks of the Courts were procured of the returns of the several Counties and were aggregated. Accident furnished a certificate, from the Secretary of State, of the respective number of votes received by Hampton and Chamberlain for Governor. The aggregated returns from the Counties corresponded with the Secretary's certificate of the aggregate of the returns, (those which had been opened by Mackey and returned to Hayne,) and upon this evidence that Hampton had the highest number of votes the House declared him Governor.

It is said that the Senate was not present. We maintain that the letter of the Constitution did not require the presence of both houses in ascertaining the fact upon secondary evidence, and the spirit of the Constitution was observed by the constitutional House of Representatives, the only branch of the political department of the State government which was acting lawfully, and its declaration is binding upon the Courts, as evidence of a fact, at least until otherwise declared.

But the Senate was present, constructively, in law.   It had notice of the action of the House, and did not (that is, a majority of Senators,) choose to attend.   Such willful absence could not mar the honest and legal action of the House, or defeat the will of the people as to the office of Governor, or affect the process of ascertaining the result of the election.   It is, moreover, a familiar maxim that where a party to be notified, or entitled to notice or demand, places himself or itself in such attitude to the party who is required to give notice or demand as to make the notice or demand an impossibility or a useless and unnecessary act, then notice or demand is dispensed with in law.   This the Senate did, in advance, by refusing to recognize or confer with the lawful House, by associating itself with the Mackey body and by surrounding itself with the bayonets of the United States soldiery, behind which it was entrenched, in violation of the Constitution requiring it to sit with open doors.

It cannot be held that the absence of the Senate, or a majority of the Senators, under these circumstances, in any way invalidated the action of the House in declaring the truth of the election, viz.: that Hampton had the highest number of votes and is Governor. The innate and intrinsic virtue of the *truth* overrides all defects and cures all irregularities in the mere formula of declaring the vote, and leaves Governor Hampton's title, *de jure* and *de facto*, where the Constitution places it,—upon the simple fact, here admitted and not contested, that *he had the highest number of votes.*

If he be not Governor, certainly D. H. Chamberlain is not Governor, either *de jure* or *de facto.*

The following proceedings took place in the case:

On March 2d, 1877, the following order was filed:

"*It is ordered,* That the relator be discharged from the custody of the Superintendent of the Penitentiary.

"A. J. WILLARD, A. J., Presiding.

"I concur in the above.

"J. J. WRIGHT."

The above order was signed on the 27th of February, and on March 1st, before it was filed, the following opinion and revocation of Judge Wright was filed with the Clerk:

On the 9th day of February, 1877, the petitioner, by her attorney, presented to this Court her petition for a writ of *habeas corpus*, setting forth therein her sentence in the Court of General Sessions for Laurens County, and her incarceration under said sentence in the State Penitentiary; that, while undergoing said sentence, on the 9th day of February, 1877, a pardon was issued to her by Wade Hampton, as Governor of the State, but that the Superintendent of said Penitentiary, upon the presentation and inspection of said pardon, refused to discharge the petitioner, and continued to restrain her of her liberty, contrary to law. She, therefore, prays the Court that the cause of her detention may be inquired into, and that she may be discharged from her unlawful confinement.

The writ prayed for was granted and made returnable forthwith. On the 10th day of February the Superintendent of the penitentiary, in obedience to said writ, appeared before this Court with the body of the prisoner, and made return that he held her under her original sentence in the Court of General Sessions, which had not yet expired, and that, as to the pardon signed by Wade Hampton, he submitted to the judgment of this Court whether the same was, in law, a sufficient authority for the release and discharge of the prisoner.

On the 12th day of February this Court proceeded to the argument of the case, which was continued from time to time until the 23d of February.

The arguments addressed to the Court may be characterized as unusually able and exhaustive and have covered the case in all its phases. It now devolves upon the Court to pass upon the questions raised and presented for its determination. These questions are, perhaps, as grave and important as have ever been brought before this Court. They are likewise embarrassed by considerations connected with the political condition and parties of the State. This Court cannot take notice of the interests, wishes or purposes of political parties as such. In its judicial capacity it knows no parties and can pay no regard to any considerations except such as concern the legal and constitutional rights and principles involved in the case before it. The fact, however, which cannot be unknown to the Court, that the contending political parties in the State regard their respective interests as largely involved in the decision of the present case, devolves upon the Court an unusual degree of responsibility, combined with matters of great inherent difficulty as

well as delicacy. As one member of this Court, I accept such responsibility with what I conceive to be a becoming spirit of self-distrust. I could have devoutly wished that such issues could have been finally adjusted in those other forums in which they at first arose; but they are presented to the Court, and they must be met, and I now proceed to present my conclusions, founded on the best reflection and deepest study I have been able to give this case.

The petitioner sets forth and pleads a pardon signed by Wade Hampton. The respondent, by his return, formally and explicitly puts this pardon in question before this Court. The first inquiry, therefore, which meets us is: "Is the pardon set forth by the petitioner a valid instrument warranting the discharge of the petitioner from her imprisonment?" Strictly speaking, this is the only question upon which the Court is now called to pass; for if the pardon is valid, the prisoner is entitled to her release; and if it is not valid, she is not so entitled. In either case the decision puts an end to the case.

Whether the pardon involved in this case is valid or not, depends upon the question whether the person who signed it as Governor is in fact or law the Governor, so as to be authorized to grant the pardon. In the wide range of the arguments addressed to the Court there is one which constitutes the decisive test in this case. I refer now to the proper construction to be given to the various provisions of Section 4 of Article III of the Constitution of the State. That Section is in the following words:

"The returns of every election of Governor shall be sealed up by the Managers of Election in their respective Counties and transmitted by mail to the seat of government, directed to the Secretary of State, who shall deliver them to the Speaker of the House of Representatives at the next ensuing session of the General Assembly, and a duplicate of said returns shall be filed with the Clerks of the Courts of the said Counties whose duty it shall be to forward to the Secretary of State a certified copy thereof, upon being notified that the returns previously forwarded by mail have not been received at his office. It shall be the duty of the Secretary of State, after the expiration of seven days from the day upon which the votes have been counted, if the returns thereof from any County have not been received, to notify the Clerk of the Court of said County and order a copy of the returns filed in his office to be forwarded forthwith. The Secretary of State shall deliver the returns

to the Speaker of the House of Representatives at the next ensuing session of the General Assembly; and during the first week of the session, or as soon as the General Assembly shall have organized by the election of the presiding officers of the two houses, the Speaker shall open and publish them in the presence of both houses. The person having the highest number of votes shall be Governor; but if two or more shall be equal and highest in votes, the General Assembly shall, during the same session, in the House of Representatives, choose one of them Governor *viva voce.* Contested elections for Governor shall be determined by the General Assembly in such manner as shall be prescribed by law."

It will serve a useful purpose to notice each successive step in the process provided for by this Section:

1. The Managers of the election are required to seal up and transmit the returns of the election of Governor to the Secretary of State, and a duplicate thereof is required to be filed with the Clerks of the Courts of the several Counties to provide a remedy in case of the loss or delay of the original returns.

2. The Secretary of State is next required to deliver said returns to the Speaker of the House of Representatives at the next session of the General Assembly.

3. It is, in the third place, provided that during the first week of the session, or as soon as the General Assembly shall have organized by the election of their presiding officers, the Speaker of the House shall open and publish the returns in the presence of both houses.

4. The next and last step is the declaration that the person having the highest number of votes "shall be Governor."

The facts to which it is necessary to allude in stating our conclusions are few and simple, namely, that an election for Governor was held on the 7th day of November, 1876, in this State; that the returns of said election were sealed up and transmitted by the Managers to the Secretary of State; that these returns were subsequently delivered by the Secretary of State to E. W. M. Mackey, claiming to be Speaker of the House of Representatives; that subsequently, upon other and secondary evidence, the House of Representatives presided over by W. H. Wallace, without the presence of the Senate, proceeded to declare Wade Hampton to have received the highest number of votes, and hence that he had become the Governor; that subsequently Wade Hampton took the oath of

office and has since claimed to be the Governor; that Daniel H. Chamberlain was the Governor from December 1, 1874, to the time of the inauguration of Wade Hampton, on December 14, 1876.

It is first to be remarked that the Constitution of the State is our supreme law whenever not in conflict with the Federal Constitution. Its provisions are to be regarded as imperative and authoritative in all cases to which they apply. No emergency can possibly arise which will warrant us in ignoring or defeating the Constitution in any of its parts or provisions. What it commands must be done. What it forbids must be prevented. The highest function of this Court is found in enforcing and applying these principles to the varied cases which may arise before it.

An election by the people is, in this country, an orderly expression of the will of the people in respect to their public officers. It is not a single act, but a process consisting of a series of acts. It may be described as a chain, whose links consist of the several stages or steps in the process from beginning to end. The casting of the ballots into the ballot box is often spoken of as the election, but it is, in truth, only one step, however important that step may be, in the elective process. If the election were to stop there, no result would be reached. The will of the people would never thus find expression. The votes must be taken from the ballot boxes, assorted, examined and aggregated. This is as essential a step, in every respect, as the casting of the ballots.

Other things also, besides the mere casting of the votes, enter into the essential elements of an election. A mere casting of votes and their counting on any given day does not constitute an election. These acts must be done in pursuance of a law prescribing them, in the manner and form required by law, and under the supervision and control of persons appointed to such duty in accordance with the law.

When, therefore, it is said that it is the election which gives the title to an office, it is meant, if the statement is to be accepted as true, that it is the election in the full sense in which we have now stated it which gives the title. In this sense, and in no other, it is true. Some degree of inaccuracy was observable in the arguments of counsel upon this point, and it is essential to clearness to state it with precision.

Looking now at the Section of our Constitution already quoted, it will be found that it presents and describes the whole process of

an election. It recognizes as parts of this process, called an election, all the several stages which have already been mentioned. It recognizes the original casting of the ballots, the counting of such ballots and the statements of the results, called the returns, the due transmission of such returns to the proper lawful custodians, and the subsequent examination and publication of the returns by the proper lawful officers in the presence or by the agency of the proper legislative bodies. All this is the mandate and clear provision of our Constitution. Logically speaking, no one of these steps can be said to be more or less important than another. The weakest link in a chain is as vital to its integrity as the strongest.

It will be admitted, without argument, that several of the steps in the process of our recent election were duly taken. It will be admitted that the ballots were cast on the 7th of November last; that they were duly counted; that the returns were duly made up, sealed and transmitted to the Secretary of State. It will be admitted that although the original returns were not in the hands of Speaker Wallace, yet that certain other evidences were presented, which, in the absence of the original returns, duly accounted for, were admissible under the Constitution and according to familiar principles of law.

We reach now the stage in the elective process when, in the language of the Constitution, "the Speaker shall open and publish them (the returns) in the presence of both houses." Pausing here, we ask if there is any reason for saying that this provision can be disregarded and still a valid election take place? Can the substance of this provision be eliminated from the elective process and still leave its validity unimpaired? If regard be had to the reason of the matter or to the prominence intended by the Constitution to be given to this stage of the process, nothing could be more essential to the validity of an election than a full, substantial compliance with this provision. The evidences of the will of the people have been thus far carefully guarded by the Constitution in the hands of lawful custodians, and now comes the critical stage when, as contemplated by the Constitution, they are to be opened and published. And what are the safeguards thrown around this process by the Constitution? They are these—the opening and publishing of the returns by the Speaker in the presence of both houses. Conceding that the returns, strictly speaking, were not in the hands of Speaker Wallace, and that the substituted evidences were ad-

missible in their stead, the inquiry arises, What is necessarily im-
lied in, and what is the true meaning of, the expression, " open and
publish"? Taken literally, no result would be reached by merely
opening and publishing the returns; they must be added up,
counted or aggregated before any result can be reached. These
words, therefore, plainly mean that the votes evidenced by the re-
turns shall be counted. But counting implies judgment—the separ-
ation and examination of the legal and illegal, the good and the
bad votes. To deny this would lead to plain absurdity. Suppose
among the returns was one not signed by any Manager—would it
be contended that it must be counted? Or suppose a plain forgery
is discovered among the returns presented by the Speaker—must
this forgery be counted? Illustrations might be indefinitely mul-
tiplied, showing that, from the nature and necessity of the case,
there must be the power, when the returns are opened and pub-
lished, to reject false, fraudulent, spurious or illegal returns. This
result points at once to the reason for the requirement of " the pres-
ence of the two houses" in the Constitution. They are to be pres-
ent in order to make the result of opening and publishing the
returns express the will of the people—to guard it against illegality
or fraud.

It has been strenuously urged that the process'here under discus-
sion is merely mechanical or physical, consisting of nothing but the
opening of the papers called returns, and the reading of what they
contain, and that thereupon, by force of the Constitution, the per-
son who appears on the face of the returns to have the highest num-
ber of votes becomes entitled to be, and is, the Governor. I cannot
admit such a conclusion. It does violence to reason. It is contrary
to the fitness of things. It is opposed to the plain interpretation of
the requirement of the Constitution. Why, it may well be asked,
has the Constitution provided for all the several stages of the elective
process so carefully, and at last has summoned together the two
houses which compose the General Assembly at the concluding stage
of the process? Is it merely in order that they may be silent wit-
nesses to the mere mechanical act of opening certain packages and
listening to the reading of them? Reason tells us no. These legis-
tive bodies are summoned to act as the authoritative arbiters in
the crowning act of this great elective process, to prevent the will
of the people and the laws of the State from being overthrown; to
so act upon the returns as to defeat violence, fraud and corruption.

This great duty is committed to the General Assembly in joint convention assembled. It is the highest, most august and responsible tribunal to which, in the first instance, such a grave duty can be confided. Why was it not, as in the case of other officers, committed to the Board of State Canvassers? One sufficient reason would seem to be that the duty was too grave and responsible in this instance to be entrusted to anybody less responsible than the immediate and responsible representatives of the whole people of the State. When by the united action of the whole body of the people's representatives the result has been ascertained, then the declaration takes effect that he who has " the highest number of votes shall be Governor." Such a result as this was not allowed to be reached through any agency less responsible than the General Assembly itself.

Upon this point no arguments could be more applicable than those drawn from an examination of the parallel provisions of the United States Constitution respecting the election of a President and Vice-President. The language of our own Constitution and that of the United States Constitution are so similar as to give application to the arguments adduced in the one case to the other. The recent discussions of the provisions of the United States Constitution upon this point, as was observed in the argument before this Court, have resulted in a general agreement that Congress, under the proper interpretation of the provision that "the President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates, and the votes shall then be counted," has power absolutely and finally to reject the entire vote of any State. They are not present as mere witnesses of a mechanical process of reading and counting the votes. They are present in their high capacity as the legislative power of the whole nation, to guard, verify and determine the result of the elective process. Not until by the action of Congress in this high capacity the result is ascertained can the result of the returns be known or stated. When that is ascertained and declared as the result of the action of Congress, the other result follows, namely: "The person having the greatest number of votes shall be President." From that point—the moment when Congress ascertains and announces the result of its examination of the returns—the Constitution may properly be said to be self-executing. The final result follows then by the fiat of the Constitution, but not till then.

Every feature of this reasoning applies to our own Constitution. Our General Assembly are not present at the opening of the returns of the election of Governor for the purpose merely of witnessing the mechanical process of opening certain packages and reading their contents. They are present to act as the grand inquest or supervising body, charged with the supreme duty of making a declaration which shall truly express the lawful result of the returns of the election. Whenever·that result has been by them ascertained and made known, then the Constitution of our State, as to the rest of the process, becomes self-executing, and whoever is so declared to have received the highest number of votes "shall be Governor." Standing upon this view of the Constitution, a view to which I am led by irresistible reasons, it is needless for me to point out the effect upon the claim of Wade Hampton to be Governor. It is admitted that the lawful Senate of South Carolina was not present, and took no part, silent or active, in the work of declaring the election of Wade Hampton. The fact of his election has, therefore, never been ascertained and declared in the manner imperatively required by the Constitution. The elective process has been arrested and cannot be completed until this requirement of the Constitution has been obeyed. It is not to the purpose to say that, as matter of fact, the returns show that Hampton received a majority of the votes. No power can say what the returns, when duly examined and declared by the only persons competent under our Constitution to examine and declare them, will show, any more than it can be affirmed before Congress has acted upon the electoral returns what the result of those returns will be. Common notoriety is of no value here. The Constitution provides but one way to ascertain and declare that fact, and that way is through the united, concurrent action of the two houses which compose the General Assembly. Until that fact is thus established, the Constitution cannot execute itself. No man can be declared to have received the highest number of votes, and hence no man can be declared Governor.

I find myself, therefore, forced to·the conclusion, under the light of the best examination I can give to the Constitution as bearing on this question, that Wade Hampton having never been declared to have received the highest number of votes at the last election by the only power competent to ascertain and declare that fact, cannot, under the Constitution, be Governor. The pardon granted by him

to the petitioner in this case must, therefore, be held to be invalid and not a sufficient authority in law to warrant the discharge of the petitioner from her present imprisonment, and the present motion must be denied.

This Court. has knowledge of the fact that Daniel H. Chamberlain was elected as Governor in 1874, and, under the Constitution, his term of office continues "until his successor shall be chosen and qualified." Under this provision of the Constitution he must be held entitled to the office of Governor at the present time. I do not agree with the view advanced in the arguments at bar that his recent inauguration has resulted in a forfeiture of his title to hold the office. That act at most could only be void and would not divest him of a former good title. The various arguments attempted to be drawn from the law of leases and of estoppel do not, in my judgment, apply to this case.

I have most strenuously endeavored to arrive at correct conclusions in the present case, for I am deeply impressed with its gravity in its relations to all our public affairs. But the Constitution is the supreme guide, and I must follow it wheresoever it leads. If I have erred, I shall greatly regret it; but I shall have the consolation of knowing that I have endeavored to honor my judicial trust by a faithful regard to my official oath and the Constitution of South Carolina.

Filed 1st March, 1877.

STATE OF SOUTH CAROLINA—IN THE SUPREME COURT, NOVEMBER TERM, 1876.

*Ex Parte* TILDA STEPENS, *alias* TILDA NORRIS—*Habeas Corpus.*

Having attached my name to an order discharging the petitioner in this case on the 27th day of February, 1877, after mature deliberation, believing that the order should not have been made, I now hereby revoke, recall and cancel said order, so far as my signature may have given it sanction, and substitute the foregoing opinion in its stead.

J. J. WRIGHT,
Associate Justice South Carolina.

On March 7th the following statement was filed by Judge Willard:

A final order was made in this case on the 27th day of February last past, with the concurrence of Associate Justice Wright, at a conference of the Court on that day, from which the Chief Justice was absent by reason of severe illness. The order in question terminated the present proceedings by *habeas corpus* by discharging the prisoner. At the request of Associate Justice Wright, I suspended the filing of the order until Saturday of this week. On Thursday an opinion was placed in my hand by the Clerk of the Court, purporting to be the opinion of Judge Wright, although not endorsed with his signature in the customary manner. This opinion was accompanied by a memorandum having the signature of Judge Wright, purporting to be a revocation of the previous order in which he had concurred.

Without receiving any subsequent communication from Judge Wright, I attended the Court on Friday, the 2d day of March, pursuant to adjournment.

It was my intention to express orally at that time the results to which I had arrived as to the questions involved in the case, but, in consequence of the absence of Judge Wright, the Court was necessarily adjourned and no opportunity afforded for such statement. I deem it important, in view of the important questions involved, deeply affecting the interest and feelings of the people of the State, and in view of the anomalous and unprecedented character of the recent proceedings taking place before a Court of last resort, to put on record a brief statement of the results arrived at by myself, intending to place them in the form of a formal opinion at the earliest practicable moment:

My conclusions are:

1. That, according to the returns of the Managers of Election in the several Counties, made in duplicate and one copy thereof transmitted, sealed, to the Secretary of State, and the other filed in the office of the respective Clerks of the Courts of the several Counties, Wade Hampton received the highest number of votes for the office of Governor of this State at the election held on the 7th day of November last.

That, such being the fact, he became Governor of this State by the direct declaration of the Constitution contained in the following

words: "The person having the highest number of votes shall be Governor," there having been no contest of the votes for Governor recognized by a concurrent resolution of the two houses of the General Assembly, as prescribed by law, under the authority of the Constitution, contained in these words: "Contested elections for Governor shall be determined by the General Assembly in such manner as shall be prescribed by law."—Art. 3, § 5.

That, inasmuch as no contest existed under the Constitution, and no two persons had equally the highest number of votes, the General Assembly had no function to perform except to establish by law a day on which he should be installed; that day being required by the Constitution to be during the first session of the Legislature.

That the only object of the opening and publication of the returns was, in such a case, notice of the facts disclosed by the returns.

I also conclude that the provision declaring the person receiving the highest number of votes, according to the returns communicated to the Secretary of State, and filed with the Clerks of the Courts, is independent of that preceding it, prescribing the duties of the Speaker of the House of Representatives, as it regards opening and publishing the returns in the presence of the houses, so that if the latter is unperformed the former is entitled to full force and effect.

2. I conclude that the acceptance by Mr. Chamberlain of the declaration of an unauthorized body to the effect that he was elected Governor, and taking the oath of office thereunder, was an unlawful usurpation of the office of Governor, inconsistent with the provisions of the Constitution in reference to the right to hold over until his successor is elected and duly qualified, and does not present a case for holding over within the contemplation and intent of the Constitution.

3. I conclude that Mr. Chamberlain is not capable of being duly recognized as *de facto* Governor, as he is without the recognition or co-operation of the popular branch of the General Assembly, and, by reason thereof, incapable in point of fact to execute the functions of Governor.

4. I hold that no executive, legislative or judicial act is requisite to fulfill any condition or remove any obstruction impeding the full execution of the purpose and intent of the clause of the Constitu-

tion declaring the person receiving the highest number of votes to be Governor, and that Wade Hampton is entitled to claim the efficacy of that clause of the Constitution, and in virtue thereof is Governor of the State of South Carolina, and his pardon duly issued is entitled to be respected.

A. J. WILLARD,
Presiding Judge.

On the 24th April, 1877, the following opinion was filed:

WILLARD, A. J. The question to be considered is whether the pardon issued by Wade Hampton as Governor of the State to Tilda Norris is valid and effectual, so as to entitle her to be released by the Superintendent of the Penitentiary, who holds her in confinement under the judgment and sentence of the Court of General Sessions for the County of Laurens.

This question resolves itself into another,—whether Wade Hampton was Governor de facto at the time of issuing the pardon in question. A pardon issued by a Governor de facto is valid. This principle is recognized as applicable to pardons issued by the King of Great Britain.—Bacon's Abr., Title "Prerogative," A. The reason there assigned shows clearly that the rule does not depend on the extent of the powers existing in the Crown, but on the character of those powers. It is placed on the ground that there should always be one capable of administering the laws at the head of the government. The existence of organized society is a primary necessity to all communities; its functions cannot safely be suspended for even short periods of time. Laws derive their efficacy, as means of protecting individual and public rights, from the physical support which is brought to their aid. In all stable governments this physical force is practically in the hands of the chief executive officer, by whatever name he may be called. Under our form of government the head of the State is commander-in-chief of the military power of the State, and as such represents the reserved force that constitutes the ultimate strength of the laws. In his relation to the ordinary and civil means of overcoming resistance to the mandates of the Courts, he has important functions to perform that can never be safely suspended. All regular governments have some mode by which the right of succession to its chief office is determined; but, whatever may be such rule

of succession, occasions have arisen and will continue to arise when a case of disputed succession exists. During such intervals there must be a continued administration of the laws, and experience of government has shown that it is safer and better to recognize the person who succeeds in obtaining possession of the executive powers during the existence of the contest than to subject the government to the risks incident to a failure in the exercise of its chief executive functions. On this foundation the doctrine rests already adverted to. Certain essential principles of government are always applicable, whatever may be the form of government, and the one referred to is of that class. That under our form of government a suspension of the executive functions would be attended with evils similar to those that have led to the adoption of the English rule as to the authority of a *de facto* head of the State is sufficiently demonstrated by the present condition of this State. Uncertainty as to the administration of the laws has not only relaxed the vigor of the criminal jurisdiction, causing an increase of crime, but has impaired public faith and confidence to such an extent as to practically paralyze the industry of the State. It must, therefore, be concluded that the office of Governor of a State is within the reasons of the rule that imparts validity to the official acts of the person who for the time being is the actual possessor of the powers of chief executive.

In order to determine whether Wade Hampton was *de facto* Governor at the time of issuing the pardon, it is necessary to consider what circumstances must exist in order to entitle a person to be regarded as *de facto* Governor.

But, before considering the state of the law as it regards this question, it may properly be suggested that it is not enough for the purposes of the present case to determine that Wade Hampton was duly elected Governor and is entitled to exercise the duties of that office, for the validity of his pardon depends on the fact that he was actually in the exercise of these powers at the time of its issuance. It is not enough that he had the right to act as Governor at that time; it must appear that he was, in point of fact, acting as Governor. But, where two persons claim each to be exercising the office of Governor, it may become necessary, in order to determine which has the better presumptive right, to look into those facts which constitute the color of their respective claims, and, in this way, the fact that one has a perfect and the other a spurious claim

may come to be judicially discovered, while the real object of the inquiry will stop short of determining the merits of their respective legal titles to the office in question. What, then, is essential in order to constitute one a *de facto* officer? In other words, under what circumstances may third persons claim that the acts of a public officer are valid and effectual, notwithstanding a fatal defect in the title by which he claims to hold the same? The authority of the cases is far from clear as to what are the essential conditions in virtue of which public official acts are regarded as valid and binding, independently of rightful authority in the public officer from which they proceeded. The various applications of the rule made in the cases that have arisen under it can hardly be said to have been generalized into any statement that can serve the purposes of an accurate guide to a sound conclusion.

The view which appears to approach the nearest to satisfying the reason of the rule as laid down, and to connect together the various points actually ruled, is embraced in the statement that to constitute an officer *de facto* he must have a presumptive or an apparent right to exercise the office, resulting from either full and peaceable possession of the powers of such office or reasonable color of title with actual use of the office.

There are two distinct cases put in the foregoing statement: One case is where one in possession has full and peaceable possession, and the other where, while in the actual use of the office, he cannot be said to have full possession of all its powers. By "full possession" is meant such possession as would enable its incumbent to fulfill all the substantial purposes of such office. The case last mentioned would embrace one where two persons claiming adversely to each other had succeeded each in becoming invested with some of the functions of the office and thereby excluding the other to such extent from the full use of the office. It is evident that these cases embrace all contingencies likely to arise and cover the principles involved. An instance of the first class may be supposed when one claims and occupies the office of Governor with full recognition and the possession of all the powers of the office in virtue of an election, It happens that subsequently it is determined judicially that the election under which such claim is made was unconstitutional and void. We suppose a case where the judgment does not proceed on the direct right to hold the office of Governor, but collaterally to it. It is clear that, notwithstanding such a decision,

the official acts of a person filling the office of Governor would still be entitled to respect as valid.— *Taylor* vs. *Skrine*, 2 Brev., 516. And yet, after it is known by final judicial action that the election was invalid and void, it could not be said that subsequent official acts derive their validity from the fact that the incumbent possesses colorable title to his office at the time of performing such acts. We may suppose a case still more severely testing these principles: As when, after the election and before the installation of the person elected Governor, a judicial determination declaring the election void had occurred, and yet the person claiming election proceeds and takes the office and becomes fully and peaceably invested with all its powers. In this case it cannot be doubted that the official acts of such person would be entitled to be respected. It will be remarked in this connection that full and peaceable possession of the gubernatorial office implies, from its nature, recognition by the branches of the government co-ordinate with the executive. In the last supposed case the officers would enter without any color of title, but against clear right, and yet it might so happen that unless such succession should take place a lapse in the administration of the laws might occur, rendering such succession desirable.

Whatever may be thought as it regards inferior offices, the ground upon which the duty of the citizens to obey the chief magistrate of the State rests should be easy of comprehension—as free as possible from mere matter of opinion and from fictions of law. Uncertainty as to duty in this respect tends to breed public disorder. If the proposition is advanced that obedience to a chief magistrate is due whenever he is found fully and peaceably possessed of the powers of his office, it is at once intelligible and the reason is apparent. If, on the other hand, it is affirmed that that duty is limited to cases where such officer has color of title, doubt and uncertainty immediately arise as to what constitutes color and what is the measure of sufficiency as applied to mere color of right.

The simple form stated is the one in which Bacon puts the doctrine of obedience to the reigning sovereign in the reference above given. The case of two persons claiming by antagonistic title, each possessed of some of the powers or functions of the same office, evidently must be treated on different principles from those just stated; neither having complete possession, a resort must be had to the respective grounds on which their several claims stand. If the question arises between third parties, where there is a dis-

puted Governorship, the Courts cannot pass judgment directly and finally upon the merits of their respective titles for the want of proper parties to such a decision. It is obvious, then, that in a collateral proceeding the question will be: "Which has the best apparent right?" The presumption of law will clearly arise in his favor. The appearance of right, real or unreal, in fact, is what is called "color," and it is manifest that color may exist from the least appearance of right to that which is complete and convincing, and which is, in itself, the highest legal evidence of right. It is manifest that if two persons are contending for the same office, and neither can take advantage of the fact of full and peaceable possession, the one that has the clearest and the best ground for raising a presumption of title ought to be preferred. It is necessary to look into adjudicated cases to see if the foregoing conclusions have adequate support. It will not be necessary to group the cases with reference to distinctive features of the question, but to consider their separate effect upon the general propositions. Such a research is indispensable before the grounds can be clearly known upon which the present controversy must be disposed of.

As would be anticipated, the English cases do not develope the doctrine in question as fully as it is stated in the American cases. In this country the modes of election and appointment and the conditions precedent to taking actual possession of office are various and often involve particulars that are not evidenced with that certainty requisite to enable the community to judge accurately as to the merits of a claim to perform the functions of a public office. The executive commission in this country, while evidence of the fact of appointment or election, is not conclusive but may be rebutted, while the royal commission is not only evidence of title but the source of title itself. Woodbury, J., in *Johnston* vs. *Wilson*, (2 N. Hamp., 202,) says: "On general principles, the choice of a person to fill an office constitutes the essence of his appointment." * * * "After the choice, if there be a commission or an oath of office, or any ceremony or inauguration—these are forms only—which may or may not be necessary to the validity of any acts, under the appointment, according as usage and positive statute may or may not render them indispensable." This authority, well supported by citations, affords an explanation of the fact that, under the local customs and laws of the various States, the question of title is sur. rounded, in this country, by many complexities.

Richardson, J., in *State* vs. *Riley*, (2 N. & McC., 356,) says: "Re-garding, then, the common law, we easily perceive why a commis-sion may be essential under the English government. There, in a word, it is at once the expression of the royal will and the partial delegation of his power. There, for the purposes of his office, the officer is the agent of the King, and his commission is his letter of attorney, wherein he finds his power, of what kind and to what extent." He further says that " in this country the officer derives no power from the chief magistrate." It is apparent, as it regards all officers in England who derive their authority by commission from the King, that the evidence of their authority is so notori-ous that no field exists for that class of contests as affecting officers of that description which are essential for a full judicial develop-ment of the principles involved. The doctrine has indeed been applied in that country to corporate officers, but it is easy to see that its application to corporate officers must involve important modifications of the rule as appropriate to the officers of the supreme government. The evils resulting from uncertainty as to the exer-cise of public authority delegated to a corporate body are local and comparatively small, while the means for remedying abuses or lapses of public authority of that class are ample.

The result reached in *Rex* vs. *Lisle* (2 Str., 1090,) was doubtless due to the peculiar relations subsisting in that country between the King and corporations existing by his grant. In that case, it was held that the want of due appointment by a Mayor who presided at a corporate election invalidated the election to such an extent that the person chosen as Mayor at such election was held incapa-ble of holding the office as against the crown. Here the origin of corporate authority is so different that a different conclusion would probably arise from the application of the principles applicable to *de facto* holding. It must be borne in mind, however, that the last mentioned case involved the effect of the public acts of an officer having no more than *de facto* authority from the crown, and differs materially from such as concern the effect of such official acts in those persons only. The principle in question would seem to find better illustration in cases involving the public authority of the reigning sovereign, for in that case the argument drawn from necessity and public convenience has its utmost force. It is said in Bacon's Abridgment, Prerogative A, quoting from Foster's Criminal Law, 399, that what constitutes a King *de facto* is "full and

peaceable possession of the crown." The reason for the rule as to *de facto* officers is stated in Viner's Abridgment, 114, as follows: "For the law favors acts of one in a reputed authority and the inferior shall never inquire if his authority be lawful." The elements of the ground of recognizing *de facto* competency, as stated in the two authorities just cited, are "reputed authority" and "full and peaceable possession." These are readily resolved into the statement already made, which places the right upon a presumption arising out of the fact of full and peaceable possession.

*People* vs. *Collins,* 7 Johns. R., 549: In this case a Town Clerk refused to file a survey of a public road on the ground that the Commissioners of Highways were not duly in office. The Court granted a *mandamus* to compel the filing of the survey on the ground that the Commissioners were *de facto* such, and the Clerk, being a ministerial officer, could not dispute their authority. In holding the Commissioners to be *de facto*, stress is laid upon their having color of title to their office. The Court says that the Commissioners "were Commissioners *de facto,* since they came to their offices by color of title, and it is a well settled principle of law that the acts of such persons are valid when they affect the public or the rights of third persons who have an interest in the act done; and this rule is adopted to prevent the failure of justice." This statement, while it recognizes the fact that color of title is adequate ground for claiming as against third persons the right to exercise the functions of an office, does not necessarily include the idea that proof of color is unnecessary when full and peaceable possession is had of the functions of such office. Had the case presented no color of title, but the mere fact of full and peaceable possession, that question would have been before the Court; but it appears to have been otherwise.

*Fowler* vs. *Beebe,* 9 Mass., 231: This was an action between third parties involving the due service of process purporting to have been served by a Sheriff's deputy. It was alleged that the Sheriff had never been appointed such. The fact was that the County in question had been newly created, but that the Sheriff had been appointed by the Governor before the Act passed, and therefore at a time when the County had no legal existence. It was held that the Sheriff was *de facto* such, and that his title could not be disputed in a case where the Sheriff was not a party; that it would have been otherwise in an action in which the Sheriff was

attempting to justify under process, or where an information to try his title had been brought. The precise grounds on which the conclusion that the Sheriff was such *de facto* rests are not stated. Judging from the report, it might have rested on the ground that the Sheriff, being in full and peaceable possession of his office, his acts were entitled to be respected, as affecting third persons, until his title was disproved in a direct proceeding, or upon the other ground that he had color of title. It is difficult to see how his title could be regarded as colorable, the fact being that at the time of his appointment there was no such office as the Sheriff of that particular County to fill, and the act of the Governor was necessarily a nullity. If that which the law adjudges bad on its face is held to have the color of good, then the idea of color has no substantial meaning or value. Then a notoriously bad title is a foundation for a claim of *de facto* competency equally with one that is presumably good, or at worst disputable. In that case, color would be a mere fiction and not a fact, and the essential fact would be the possession had of the functions of the office. It will be hardly necessary, after the substantial reasons of the rule given by Bacon, to have resort to a modern fiction for the purpose of founding the doctrine upon its principles. With time fictions tend to give way to the substantial truths they cover, but the reversing of this process is an unfavorable indication. When proof of color of title is resorted to for the purpose of converting a partial possession of the functions of an office into a possession recognizable as full and complete, it serves a substantial purpose and should be defined in a manner agreeable to the substantial office it is called upon to perform. If the idea of color is confined to titles that may be presumed good without violating any rule or principle of law, then a test is afforded that can yield substantial assistance in defining the grounds of the efficacy of official acts. It certainly would not fairly represent the decision of the case last adverted to to hold that it had determined that the title of the Sheriff had color of being good notwithstanding it appeared, as matter of law, that the appointment was wholly void.

*Backman* vs. *Ruggles*, 15 Mass., 180:

This case clearly involved a question of color of title. A Deputy Sheriff had been appointed, but had not qualified for the discharge of the duties of his office. The failure to qualify was matter of fact that demanded proof, and it is a clear case for third parties to rest

on the presumption that all was rightly done that was requisite to perfect his right to exercise the office under his title.

*Mason* vs. *Dillingham* (15 Mass., 170,) occupies the same ground as that last stated.

*Johnston* vs. *Wilson*, 2 N. Hamp., 202: This case turned on the right of a defendant to justify in trespass under authority of an office claimed by him. Still, the case contains valuable references to the general doctrine as affecting third persons, and recognizes the rule applied in the two cases from the Massachusetts report just cited.

*McBee* vs. *Hoke*, 2 Speer, 138: The action of one claiming to be Coroner was here in question as affecting third persons. He had been duly appointed, but had failed to qualify. It appeared that he had held the office for the prior term under due appointment and qualification, and was entitled to hold over until his successor was duly appointed and qualified. The Court held that he was *de facto* Coroner and his official acts were binding on third parties. Judge O'Neall, who delivered the opinion of the Court, with his accustomed vigor and aptitude to lay hold of the substantial truth of cases, says: "I take the broad ground that, being found in office, of which he had been the incumbent for many years, the plaintiff had the right to regard him as Coroner, and his acts for them are good." Again, he says: "One in office and transacting its duties is supposed to be rightfully there, and, so far as third persons are concerned, that presumption legalizes his acts." Here are two consecutive statements, the first of which embodies the facts on which the efficacy of the official acts in question depended, and the last the rule applicable to such facts. In the first statement long-continued possession is spoken of, but when the rule is stated importance is not attached to the duration of such possession. The Coroner, in that case, had been many years in the office, and that fact was important as tending to show that his possession was full and peaceable; but Judge O'Neall did not place the right of his official action to recognition on the ground of its duration. The reason of this is obvious. As the terms of office in this country are short, the rule would be of little value if only applicable to cases of long-continued possession, using this term in the sense in which it is used in connection with the rule of law inferring presumptively title to property from the fact of long-continued possession. The presumption of title to office as validating official acts

does not arise out of the principle of the rule just referred to, but out of another and distinct rule, having its foundation not in the nature of evidence but in considerations of public policy and convenience. It is because the functions of the body corporate, like those of the physical body, ought always to be performed that validity is ascribed to the official acts of persons improperly in office.

Judge Evans, in *Kotman* vs. *Ayer*, (3 Strob., 92,) while approving the language just quoted from Judge O'Neall, thinks that it was not necessary to the case before him, and, therefore, to be regarded as *obiter dictum*. It is true that the Court of which Judge O'Neall was a member might have put the decision in the case of *McBee* vs. *Hoke* upon the ground that the Coroner, being duly appointed, was in under color of title, notwithstanding his failure to qualify. They did not, however, place the case on that ground, but distinctively on the proposition laid down by Judge O'Neall. When a Court lays down a proposition and places the decision of the case distinctly upon it, its acts should have authoritative weight, even if other grounds existed upon which the judgment of the Court might have been placed. It is impossible, at all events, to resist the conclusion that the case under consideration developes not only the sound theory of the subject but a practicable rule suited to the emergencies calling it into action.

*State* vs. *Hill*, 2 Speer, 50: Here David R. Coleman claimed the office of Coroner, to which an appointment had been made in the name of Daniel Coleman. The whole Court concurring, Judge O'Neall places the conclusion that David R. was *de facto* Coroner upon the decision in *McBee* vs. *Hoke*. The Court escaped the necessity of saying whether an appointment of Daniel was sufficient color to enable David R. to claim the office from the fact of full and peaceable possession, which brought the case within *McBee* vs. *Hoke*. This was a fortunate circumstance, for if the appointment of Daniel could give color of title to David R., it could equally well give it to any other person having the same surname.

*Kotman* vs. *Ayer*, 3 Strob., 92: The Justice in this case was duly appointed, but failed to qualify. The case was distinctly decided on the ground that he had color of title. Judge Evans, in the opinion of the Court, says, referring to the language of Judge O'Neall quoted above: "These propositions, though not absolutely necessary to be affirmed in that case, and which may be supposed to be mere *dicta*, I

propose to show are supported by all the authorities." He adds: "I do not undertake to say that in an organized state of society, under a regular government, the acts of an usurper, of one who obtrudes himself into an office without color of claim, would be binding; but where the electing or appointing power has conferred the office upon him, and he is in the actual discharge of its duties, without his title being questioned in any legal way, the community in which he lives have a right to regard him as a legal officer, and his acts as to them will be valid." The statement very correctly places the authority to be ascribed to the official acts of one improperly in office upon the right of the community, for its own convenience, to regard him as such. The case of an usurper referred to evidently carried in the mind of the Judge the idea of one attempting to force his will against that of the whole community. It is evident that while such a state of things should exist such usurper could not get the benefit of the rule that exacts proof of full and peaceable possession. But should the community conclude that it was better for a short time to submit to the usurper than to encounter greater possible evils, there is no sound reason why they should not be permitted to do so. The rule in question looks solely to the convenience of the public and pays no regard to any supposed right of a mere intruder. The case here put, of having a good color of title, was the very case before the Court, and it is reasonable to conclude that Judge Evans intended to carry his statement of the rule only so far as was essential to the decision of the particular case. On the whole, this case does not appear to add to or detract from the strength of the decision in *McBee* vs. *Hoke* beyond indicating that the rule there broadly laid down admits of some limitations. In stating the rule as extending only to cases of full and peaceable possession, it would seem that such a limitation as that implied in *Kotman* vs. *Ayer* might be solely reached.

*State* vs. *Heyward* (1 N. & McC., 546,) follows *Rex* vs. *Werbst*, (3 Camp., 432,) holding that one not having legal title as a Justice could not administer an oath so that perjury would lie as for false swearing. To such cases the rule under examination is not considered as extending.

*Taylor* vs. *Skine*, 2 Barr, 566: The official acts of a Circuit Judge are called in question in this case. He had been appointed by the Governor, but subsequently the authority under which the appointment was made was held to be unconstitu-

tional. The official acts of the Judge were held valid, but the case was put on the ground that he had color of title. It is probable, from the citations, that the Court intended to follow the statements of the rule in the New York cases, which appear to lay stress on the possession of color of title. The New York cases do not appear to have intended an exhaustive statement of a rule, and were not such as to call for the consideration of the question whether, in the absence of color, possession of a certain character could be sufficient ground for validating official acts. *Taylor* vs. *Skine* would doubtless be more readily and satisfactorily explained upon the grounds laid down in *McBee* vs. *Hoke*, but that view of the case does not appear to have been presented or considered. Had such case been regarded as conflicting with the views presented in *McBee* vs. *Hoke*, it would no doubt have been particularly noticed in that respect in the last named case. It will be observed that the cases do not call in question the correctness of the rules stated in Bacon's Abridgment, already referred to, in their application to the chief executive, whilst a reasoning that runs through them has the same character with that given for the authority of a *de facto* King to issue a valid pardon. It is also noticeable that nowhere is the case considered of two persons each claiming adversely to the other partial possession of the same office, and each referring their right to a claim of title, and each showing something that may be regarded as color of title. It would follow then that the rule which has been stated is, at all events, applicable to the acts of the chief executive in their bearing on third persons, and that the effect of inconsistent claims as to the possession of color of title must be determined according to the principles involved without decisive aid from the adjudicated authorities. Applying, then, to the present case the test of full and peaceable possession, it becomes necessary to inquire whether Wade Hampton, at the time of issuing the pardon, had full and peaceable possession of all the necessary functions of the office of Governor. It will not be necessary to state all the facts and circumstances having a bearing on the question.

It is enough for the present purpose to know that Daniel H. Chamberlain claims to be Governor of this State, and is recognized as such by the Senate, while Wade Hampton holds the recognition of the House of Representatives. Without recognition of both bodies that comprise the General Assembly, no person can be said

to have full and peaceable possession of the office of Governor, for the most important duties of the office relate to the share that the Governor is entitled to take in the exercise of the law-making power. A failure on the part of either branch of the Legislature to recognize the person claiming to hold the gubernatorial office places it out of his power to perform functions essential to the office of Governor, and without the performance of which the purposes of that office cannot be said to be fulfilled. This Court has already decided, in *Wallace* vs. *Mackey*, that the body presided over by Speaker Wallace is entitled to be recognized by the judicial authority as the House of Representatives. It is this House that recognizes Mr. Hampton. The body presided over by Mr. Mackey, not being judicially recognizable as the House of Representatives, its recognition is of no legal importance. It follows that neither of the claimants can show that he has full and peaceable possession of the gubernatorial office, and the next question that arises is, which is entitled to recognition on a ground of possessing sufficient color of title? Both are in possession of some of the functions of the office, while there are functions that, at the present moment, neither can fully perform. It is clear that it is not pertinent to ask which has a greater share of the proper powers belonging to the office in question, as that fact cannot become decisive between them in this case. One or the other has the better apparent or presumable right, and it is perfectly manifest that, from the nature and necessity of the case, as well as from the application of the principles and tests already discussed, resort must be had to the evidence of title exhibiting the nature of their respective claims of right to take the office in order to see which has the best apparent or presumptive right.

That claim to perform must. be preferred which arises from the performance of acts of public authority conformable to law and appropriate to perfect or present right to enjoy the office in question.

Two things are essential to perfect a present right of possession—election and installation. Election determines the right to succeed the existing incumbent at the time and in the manner prescribed by law, and installation establishes a present right to exercise the functions of the office.

The color of title by which the respective parties claim consists of certain public acts claimed to amount to an election and installation.

Looking into the evidence that discloses the fact of the performance of these acts, we are to say whether either of the persons claiming to possess the office of Governor shows a due performance of all acts of public authority essential to complete a present right to the office. Both cannot show that fact. One or the other must show a failure in some or other of the essentials in this respect. If we find that either possesses clear evidences of that character, it is evident, if the principles already presented should govern this case, that he must be recognized as Governor *de facto*. Although, as has already been said, the issue joined does not impose upon us the necessity of determining the absolute *de jure* right of either, yet that color of title must be preferred that rests on the best grounds—on the appropriate acts of public authority that, under the law, complete a legal right of present possession. If, then, we find that either of the persons shows a title of that kind, the inquiry must stop, for that fact excludes the possibility of any right in the other. The question then arises, is it made to appear that Wade Hampton has been duly elected and installable as Governor? The person properly filling that office is made such by the Constitution, through conformity with its provisions. The Constitution, as will appear, assumes to provide all the means requisite to the accomplishment of this purpose, and gives the sanction of authority that accompanies and follows the exercise of such means. The provisions of the Constitution bearing on the subject are as follows:

"ARTICLE III, SECTION 2. The Governor shall be elected by the electors duly qualified to vote for members of the House of Representatives, and shall hold his office for two years, and until his successor shall be chosen and qualified, and shall be re-eligible. He shall be elected at the first general election held under the Constitution for members of the General Assembly, and at each general election thereafter, and installed during the first session of the said General Assembly after his election, on such days as shall be provided by law."

ARTICLE III, SECTION 4: "The returns of every election of Governor shall be sealed up by the Managers of Election in their respective Counties and transmitted by mail to the seat of government, directed to the Secretary of State, who shall deliver them to the Speaker of the House of Representatives at the next ensuing session of the General Assembly, and a duplicate of said returns shall be filed with the Clerks of the Court of said Counties, whose

duty it shall be to forward to the Secretary of State a certified copy thereof upon being notified that the returns previously forwarded by mail had not been received at his office. It shall be the duty of the Secretary of State, after the expiration of seven days from the day upon which the votes have been counted, if the returns thereof from any County have not been received, to notify the Clerk of the Court of said County and order a copy of the returns filed in his office to be forwarded forthwith. The Secretary of State shall deliver the returns to the Speaker of the House of Representatives at the next ensuing session of the General Assembly; and during the first week of the session, or as soon as the General Assembly shall have organized by the election of the presiding officers of the two houses, the Speaker shall open and publish them in the presence of both houses. The person having the highest number of votes shall be Governor; but if two or more shall be equal and highest in votes, the General Assembly shall, during the same session, in the House of Representatives, choose one of them *viva voce*. Contested elections for Governor shall be determined by the General Assembly in such manner as shall be prescribed by law."

ARTICLE VIII, SECTION 10: "In all elections held by the people under this Constitution the person or persons who shall receive the highest number of votes *shall* be declared elected."

A general election was held on the 7th day of November last. Returns were made out by the Managers of Election in the several Counties in duplicate. One copy of these returns was sealed and transmitted by mail to the Secretary of State and the other copy was filed in the offices of the Clerks of the Courts of the respective Counties. Thus far the law was fully complied with. It is in evidence that, according to these returns, Wade Hampton was elected Governor. It is to be observed that, by the Constitution, the returns constitute an open record from the time they are made out by the Managers of Election, and as such are required to be filed as open public records in the offices in which records intended for general public information are usually filed. The sealing of the duplicate copy delivered, intended for the Secretary of State, is not for the purpose of concealment of the facts set forth, but to insure against alteration while being transmitted to the hands of the Speaker of the House of Representatives. In this respect the Constitution of this State differs from that of the United States, attending which last no publication of the results of the voting of

the Presidential election can take place until a proper body is constituted, consisting of the Senators and members of Congress, to witness the opening and publication thereof.

In this State, publications for all general purposes, including the forming of evidence on which to base judicial action, is accomplished, by the direct command of the Constitution itself, by the act of filing in a public office. The subsequent publication before the two houses of the General Assembly is obviously for the purpose of acquainting them with the result of the election, so as to enable them to ascertain whether they are called upon to perform the only acts in reference to the gubernatorial election committed to them, viz.,—making choice between two candidates having equally the highest number of votes, and determining any contest of the vote for Governor that may appear to be made in the manner prescribed by law. The effect of that clause of the Constitution that declares that "the person having the highest number of votes shall be Governor" is that if it appears by the record, consisting of the Managers' returns, that any one person has received the highest number of votes, such person becomes *ipso facto* Governor, unless a case contesting the truth of that record is presented in competent form. Has there been a competent contest of the vote for Governor? The language of the Constitution on this point is that "contested elections for Governor shall be determined by the General Assembly in such manner as shall be prescribed by law."—Article III, Section 4. A contest is a proceeding more or less formal, by which conflicting claims to an election are determined by some competent body. The mode of conducting such contest is prescribed by statute in the following terms, (Gen. Stat., 32, § 28): "That in case of a contest of the election of Governor, (if the General Assembly, by concurrent resolution, shall entertain the same,) the Senate and House of Representatives shall each, separately, proceed to hear and determine the facts in the case, so far as they deem necessary, and decide thereon who, according to the 19th Section of Article VIII of the Constitution, is entitled to be declared elected. If the two branches of the General Assembly come to the same decision, they shall, by concurrent resolution, declare who is duly elected and entitled to enter upon and exercise the office of Governor, and such person shall thereupon, upon taking the oath of office prescribed in the Constitution, be inducted into office." The statute then provides for an election in case the houses cannot

agree. A contest presupposes parties opposed in interest, a subject of controversy and notice thereof brought to a body capable of determining it. A contest of the vote for Governor must be recognized according to the terms of the statute by a concurrent vote of the two houses, otherwise it cannot exist as such. The Constitution in terms having subjected such contest to the rules of proceeding prescribed by law, and a law following that constitutional authority having prescribed, as a condition precedent to its legal existence, that a concurrent resolution should be adopted recognizing the fact of contest, it follows that no contest can be deemed to exist unless such a concurrent resolution was adopted. No such concurrent resolution appears ever to have been passed. The Journals of the Senate and House of Representatives show no such resolution, and none is pretended. No concurrent action of any kind took place between the Senate and House of Representatives. It is not necessary to look into the proceedings that took place between the Senate and the body popularly called the Mackey House, as the latter body has no legal character. It may be remarked, however, that it is not pretended that any concurrent resolution of that kind was ever adopted by those bodies.

The foregoing conclusively settles that no case for disputing the truth of the Managers' returns has been legally or constitutionally created; but it may be observed that it does not appear that there was before either branch of the General Assembly any notice whatever of any such contest either forwarded with the Managers' returns or brought in by memorial or otherwise, or that parties to any such contest were represented, or that any action was ever taken by either house separately to determine the facts of any such contest. It therefore follows that the declaration of the Constitution, " the person having the highest number of votes shall be Governor," was entitled to the full force intended for it. It remains to consider what is that force. This provision is to be considered with the general legal proposition that the election and not the mode of subsequent authentication constitutes the essence of *de jure* right.— *Johnston* vs. *Wilson*, 2 N. Hamp., 202.

The Managers' returns constituted the primary evidence of the fact of election, made such by the Constitution itself, and the declaration that the person having the highest number of votes shall be Governor must be referred to the constitutional record evidencing the facts. If the record is disputed in a competent mode,

then the declaration of the Constitution is displaced, and the determination of the contest disputing such record and the declaration of the General Assembly, based on such determination, become the efficient means of designating the person to be Governor.

In the present case the evidence created by the Constitution was not disputed by any competent contest and remained final and conclusive both upon the Legislature and the Courts. The Constitution does not require, in cases of this kind, that any declaration whatever shall be made as a condition precedent to the vesting of right to the office of Governor. It is contended, however, that transmitting the sealed Managers' returns to the Speaker of the House of Representatives and the opening and publication of returns in the presence of the two houses are conditions precedent to the force of this declaration of the Constitution becoming effective by way of constituting a Governor. Are they made such by the express terms of the Constitution or by any necessary or reasonable implication?

The strongest argument that can be drawn from the text of the Constitution in support of the view is based on the fact that the transmission of the returns to the Speaker of the House of Representatives is spoken of first in order; then the opening and publishing of the returns, and then follows the declaration in question. The proceedings in the General Assembly are spoken of in one sentence. Then follows, in a separate sentence, the declaration. There is no grammatical evidence of an attempt to connect them. The argument from position is all that can be drawn, and that is, at least, merely inferential, and the weakest kind of argument that can be applied to the ascertainment of the meaning of language. Ordinarily, statutes imposing duties on public officers endeavor to present their duties in a successive order, approaching, as nearly as possible, to that in which, in point of time, the events will arise to which they relate. This is done as a matter of convenience. It is not to be assumed that in statutes of this class the various provisions introduced are so placed as to evidence in the clearest manner their legal dependence or independence of each other; for that mode of grouping is not customary and is unlikely to become so until Legislatures are wholly filled by lawyers and logicians. The reason of a statute is to be arrived at by less formal means. There is no evidence on the face of the Constitution of any express intent to make the force and effect of its declarations dependent upon the

performance by the Legislature of the duties cast upon it. It is equally clear that it is not a necessary implication, for the antecedent acts are not essential to the efficacy of the declaration. It is only that which is necessary and essential that is drawn into the text of a statute on the ground of necessary implication. This will more fully appear when the argument in favor of allowing the view contended for as a reasonable implication from the text is considered.

The general object of a statute must be considered in order to ascertain what is or is not a reasonable inference from its terms. The object of the Constitution was to establish a permanent form of government. As essential to that object, it sought to distribute the great powers of government,—legislative, executive and judicial,—between three co-ordinate branches, each as independent of the other two as prudence would permit. While each was capable, in the nature of government, of acting more or less upon the others, still it was obvious that the existence of one or the other of these great and necessary features of the government should not become dependent upon the performance by another of these bodies of mere acts of form and ceremony. If such should be permitted, one might destroy the others and break up the balance and equilibrium of the powers of government and subvert the essential objects of the Constitution. This principle is so plain that it needs no elucidation.

It is only necessary to bring the present case within the principle just stated to dispose of the construction contended for. Where there is a choice on the face of the returns, and no contest of the truth appearing on their face, the Legislature has nothing but a formal duty to perform. That its duty is not of substance appears by the fact that it cannot affect the result if duly performed; and its only substantial significance would arise from such a construction as would allow a failure in the performance of such duty to defeat the object of the Constitution, viz., the succession of the person chosen by the electors to the office to which he had been elected. The act of opening and publishing the returns is clearly for the purpose of giving them information enabling them to see whether they have any duty to perform in the premises. For all other purposes publication took place at the filing of the Managers' returns with the Clerk of the Court. If there had been no choice on the face of the returns, then the duty would have been substan-

tial in its nature, as we have already seen. So, had there been in point of fact notice of a contest, the duties of the two houses might have been substantial had they chosen to recognize the existence of such contest by a concurrent resolution. The failure to perform their general duty left the question in the simple form in which it stood on the face of the returns. It therefore appears that the only substantial function possessed by the General Assembly consisted in disputing the returns, and failing to exercise this function had only the effect to leave the returns in full constitutional force and to leave the Legislature in the position of neglecting a duty formal in its nature merely, which, upon the construction contended for, would effect a destruction of the existence of a rightful claim to the executive office. That such a construction could have been approved by legal minds imbued with the principles of constitutional law can only be accounted for by the force of party interests for a time obscuring just views of fundamental principles. One of the most important principles of the foundation of constitutional government, and essential to its stability, is this: That unconditional declarations of the supreme law, capable in their nature of taking force without the intervention of any act—either legislative, executive or judicial—derive full efficacy from the Constitution itself and become *ipso facto* executed. This principle, now fully understood and applied by the Courts, is decisive in its application to the matters just considered, while applying with equal force to that which is to follow.

Thus far we have considered which of the parties claiming to be in the office of Governor possesses reasonable color of title, so far as it regards the claim to have been elected to that office, and we have found that the one whose pardon is the subject of the present discussion possesses that advantage. It remains to consider whether the circumstances attending the accession of each to supposed possession of the office afford in themselves color of title that cannot be questioned.

It is not necessary to consider what might have been the effect if Mr. Chamberlain had been inducted into the office of Governor by the full consent and co-operation of both bodies of the Legislature, for such was not the case. Had it been, it is unlikely that two distinct persons would be found at the same time each claiming to have actual possession of the office.

Recognition by the Legislature would have practically placed the recognized incumbent in undisputed possession and left it to the other contestant to find means of asserting a claim to the office *de jure*. The recognition of Mr. Chamberlain by the Senate alone, without the House of Representatives, was without effect for any purpose; nor did the Senate, uniting with a body of persons possessing no legal competency, confer any color of title on him as claiming incumbency through such an act.

Mr. Chamberlain in assuming to take the office must be regarded as owing such possession he may have to an act of unlawful usurpation. This act was rendered possible by the use of unlawful military force in controlling the organization of the legislative body, and carried out, notwithstanding the decision of this Court divested the body resulting from such forced organization and styling itself the House of Representatives of all right to recognition by that title in the Courts. It was upon the authority of such illegal body, and after its character was ascertained by this Court, that Mr. Chamberlain attempted to rest his right to take possession of the gubernatorial office upon a claim of having been elected Governor for two years at the last general election.

An act thus clearly violative of the Constitution as interpreted by this Court, and accomplished in defiance of the right of this Court to give a final construction to the Constitution, can have no effect to confer color of title upon an alleged incumbent.

But it is said that, admitting that the attempt of Mr. Chamberlain to possess himself of the office for the new term proved abortive, still he must be regarded as holding over under his antecedent term, under the constitutional right to hold over until his successor was chosen and duly qualified.

There are two answers to this proposition. The first is that he had voluntarily abandoned the office by his former title when he assumed to hold by a new title and tenure; and that his successor having duly qualified by taking the oath of office the constitutional right ceased and could no longer afford color of right to its possessor.

Counsel have ably and elaborately argued from the principles applicable to leases and from grants from the crown to show that the acceptance of a new title and tenure is a virtual relinquishment of any unexpired title or tenure derived from the same source subsisting at the time of taking the new title and tenure.

Even if it were conceded that the principle contended for in this respect were not fully illustrated in the class of cases adverted to in the argument, it is free from doubt that they are applicable in the present case.

The whole object of the Constitution in directing that certain public officers should continue to discharge the duties of their offices after the expiration of their legal terms and until their successors should be duly chosen and qualified was to provide for the discharge of the public functions annexed to such offices until there should be found to assume their exercise persons possessing rightful competency. If a third party had claimed to have been elected and qualified to take the office, and the outgoing Governor had seen fit to recognize his right of succession, and permitted him to assume the functions of Governor, it will not be pretended that the former incumbency could be resumed under any circumstances, even though it should be found that such successor was not elected or qualified according to law. The effect of allowing succession, though in the same person, is the same, because the same reason underlies it. To hold that one who, at the termination of his office as chief magistrate, attempts to perpetuate his incumbency by a clear act of unlawful usurpation, and, when driven from that claim, may fall back upon a provision of the Constitution designed wholly and exclusively to facilitate the transmission of the chief magistracy from one lawful successor to another, contradicts all legal reason, and would be equivalent to surrendering the highest office in the government to become a prey for the crafty and unscrupulous. It is unnecessary to elucidate this proposition, novel as it is, for it is at once condemned by that right sense of justice that lies at the foundation of law, and has no support in any known principle or precedent.

Not only did the outgoing Governor evince an intention to relinquish the office as previously held by him under authority of a former election and qualification, but in point of fact he lost that full and peaceable possession that he previously had the moment he assumed to take it at the hands of an unlawful authority, by losing at the same moment recognition by the House of Representatives requisite to complete possession, and from that moment the fact of possession passed into legal doubt and dispute. It is the settling of that dispute that constitutes the matter of especial interest in the present case, and, as we have already seen, the decisions of the

Courts bearing on the question of *de facto* holding afford certain rules and principles upon which that disputed question of possession must be determined.

On the other hand, the facts of the Governor elect having been duly elected and qualified and having taken the oath of office, whereby he became qualified to succeed to the office, are circumstances that afford indisputable color to his claim, because resting on proof that would be conclusive, if the direct question of his legal right to the office were now presented for decision.

It is contended that the clause of the Constitution providing that the Governor elect should be installed on a day to be fixed by law during the first session of the Legislature precludes his being duly installed on any other day than on one fixed in the manner prescribed. It appears that no day has been fixed for that purpose by law since the adoption of the Constitution.

The only object which the Constitution had in view was to make it imperative that the installation of the Governor should not be postponed beyond the end of the first session of the Legislature assembled after the election. Installation implies an act to be performed by the outgoing Governor and one to be performed by the Legislature. That to be performed by the outgoing Governor consists in placing in the hands of the incoming Governor the public property and insignia attached to the office of Governor; that to be performed by the Legislature consists in the recognition of the new Governor by acting with him in the conduct of public business. The fact that the Legislature failed in its duty in this respect did not absolve the outgoing Governor from performing that which was incumbent on him. He was, during the first session of the Legislature, under a conditional obligation to surrender the property and insignia of the office to his successor. That condition had reference solely to a day during that session to be fixed by law for that purpose. The moment that session was at an end the duty became absolute, and he was bound without delay to put his successor in possession of whatever was essential to complete performance of the functions of his office. If it were otherwise, it would happen that, as the first session of the Legislature is ended, no authority exists to fix a day, and the gubernatorial authority has lapsed for the constitutional term of two years, or, at least, is held by a mere *locum tenens*. The correctness of this view is so clearly apparent that further elaboration is altogether unnecessary. It is

clear that Wade Hampton had full right to claim possession of the office of Governor at the time he assumed to take such possession, and the color by which it is claimed that his actual exercise of authority ought to be respected is perfect.

It is hardly necessary to note much that has been said during the recent period of undue and unhealthy political excitement in regard to the powerlessness of the Courts to determine controversies of this class. It is clear that no power can be rightfully exercised unless recognized by the Courts, whether that power is claimed to be lodged in the hands of an Executive or of a Legislature.

The Courts are created to defend the Constitution as well as the laws, and this defense must be made, as against all usurpation of public authority whatever not permitted by the Constitution and laws, the duty of the citizen, under the Constitution and the laws, as measured out by the Courts. If the Courts fail to perform such duties, the fault is not in the system but in the Judges who occupy the bench, and they are capable of being removed by constitutional means. When the Courts cease to speak the law, the remedy is with the Legislature. While the Courts are enabled to perform their functions to the State and to the people, the only legitimate use that can be made of physical force is to execute their mandates. If the Courts should ever assume to deprive the co-ordinate branches of the government of their independence or rightful authority, the remedy would be clearly at hand. If, on the other hand, the Courts are stripped of their actual authority by popular violence, then it is competent for the law of force to supplant that of reason and martial authority to be installed as the last resort to maintain the government. Fortunately no such contingencies have arisen until this time. The proceedings of the Courts have been orderly and effectual, and both the rights of the people, as established by the Constitution and laws, and the rights of those exercising public authority have been respected. Under such circumstances as might have been anticipated, a resort to irregular and unsanctioned forms of force has proven abortive to defeat or prevent the irresistible force that lies at the basis of a government of law resting on right reason, which, while all-pervading and diffusive in its influence, lies in safety in its citadel and stronghold, beyond the reach of physical force, so long as the people love and trust to the principles of justice.

The pardon of Wade Hampton is entitled to be respected as the official act of the Governor of this State.